*Zimmerman Weiser & Paray LLP*
**226 St. Paul Street**
**Westfield, New Jersey 07090**
Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| JORGENSEN & COMPANY, | ) | Civil Action No. |
| Plaintiff, | ) | (Newark Vicinage) |
| v. | ) | |
| GARY SUTHERLAND, NAPLIA, LLC, | ) | Case No. |
| PLAZA INSURANCE COMPANY, | ) | |
| ROCKHILL INSURANCE COMPANY, | ) | **VERIFIED COMPLAINT** |
| Defendants. | ) | **AND JURY DEMAND** |

Plaintiff, Jorgensen & Company ("Jorgensen"), by way of its undersigned attorneys, for its Verified Complaint against Defendants, alleges as follows:

### SUBSTANCE OF THE ACTION

1.     This is an action for copyright infringement, trade secret theft, tortious interference, and unfair competition in violation of the laws of the United States and the State of New Jersey.  Plaintiff seeks a permanent injunction, damages and related relief.

### PARTIES

2.     Plaintiff Jorgensen is a corporation formed on January 3, 1994 under the laws of New Jersey and is domiciled in New Jersey.

3.     Upon information and belief, Defendant Gary Sutherland ("Sutherland") is a resident of Massachusetts.

4.     Upon information and belief, Defendant NAPLIA was formed under the laws of the state of Delaware and is based in Massachusetts.  Upon information and belief, all of the

members of NAPLIA are either domiciled in Massachusetts or in Connecticut.   Upon

information and belief, the principals of NAPLIA are licensed by the New Jersey Department of

Banking and Insurance and operate in New Jersey under license 1283369.   Upon information

and belief, NAPLIA conducts business in New Jersey.

5.       Upon information and belief, Defendant Plaza Insurance Company ("Plaza") is a

wholly owned subsidiary of Rockhill Insurance Company ("Rockhill") that is domiciled in Iowa

and based in Kansas City, Missouri.  Upon information and belief, Plaza is licensed by the New

Jersey Department of Banking and Insurance and operates in New Jersey.

6.       Upon information and belief, Defendant Rockhill is a member company of State

Automobile Mutual Insurance Company ("State Auto"), domiciled in Arizona, and based in

Kansas City, Missouri.  Upon information and belief, Rockhill is licensed by the New Jersey

Department of Banking and Insurance and operates in New Jersey.

**JURISDICTION & VENUE**

7.       This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §

1332 given there is complete diversity of citizenship of all parties and the amount in controversy

exceeds $75,000.00, exclusive of interest and costs.  The Court also has subject matter

jurisdiction under 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331, 1338(a) and 1367.  The Court has

supplemental jurisdiction over the state law claim under Section 1367(a) of the Judicial Code, 28

U.S.C. § 1367(a) and under principles of pendent jurisdiction.  Personal jurisdiction is available

as against defendants given their significant and ongoing contacts with New Jersey, including but

not limited to providing licensed services to clients in New Jersey and being regulated by the

New Jersey State Department of Banking and Insurance.

8.      Venue is proper under 15 U.S.C. §§ 1391(b) and (c), because Defendants do business in, have substantial contacts with and/or may be found in the District of New Jersey.  In addition, a substantial portion of the events at issue impact Jorgensen in this vicinage and were directed at Jorgensen in this District.

## BACKGROUND AND FACTS

9.      Jorgensen's relationship with the principals of Defendant NAPLIA – Sutherland, Stephen Vono ("Vono") and Dogan Tuncel ("Tuncel"), goes back to the late 1990's when Jorgensen worked with the Herbert H. Landy Insurance Agency, Inc. ("Landy").  Sutherland and Vono were employed as insurance producers in the direct sales department at Landy.  After Sutherland's employment relationship with Landy was terminated, he entered into an agreement with Jorgensen as an independent contractor producer.   Sutherland was included under the corporate insurance licenses of Jorgensen and protected by the Jorgensen errors and omissions insurance coverage.

10.      In March 1999, Jorgensen and Sutherland agreed to the following terms regarding their business relationship:

- GS agreed to assume the role of the local office of Jorgensen & Company in MA. This will entitle GS to use all Jorgensen markets and receive a more generous commission share than a usual sub-producer. Ownership of the clients developed in MA will be shared between Jorgensen and GS, based upon a proportional arrangement (final details to be agreed).

- Jorgensen will arrange for printing of letterhead and business cards. GS will provide for details for same. Jorgensen will arrange E&O insurance and corporate licensing.

- All billing, premium financing and payment of markets will be undertaken by Jorgensen.

- Jorgensen will remit commission share to GS on the 15th and 30th of each month (subject to payment of premiums by clients and less

any return premium adjustments). GS will arrange for the payment
of all income taxes, social security and FICA. Jorgensen will make
payments to GS gross and provide GS with a 1099 statement.

- GS will develop a business plan and submit this to Jorgensen for
discussion. Jorgensen will work with GS to undertake marketing
initiatives and provide GS with back-office support.

11.     Upon his hiring as an independent contractor producer, Sutherland was paid to
produce clients for Jorgensen's CPAGold™ Accountant's Professional liability Insurance
program.  Since its formation in 1998, Jorgensen has been the exclusive and sole manager of a
risk purchasing group insurance program called Professional Adviser's Purchasing Group, Inc.
with the brand name "CPAGold™".  The first CPAGold™ insurance policy incepted on
February 23, 1999.  By way of background, a risk purchasing group is a grouping of
policyholders with similar liability risks – in this case, accountants, who jointly purchase liability
insurance authorized by the Federal Liability Risk Retention Act of 1986. This program is
licensed for sale in all states except for Alaska and Jorgensen is the appointed agent, *i.e.*, General
Agent, and program manager in all of these state filings.

12.     In addition to its proprietary insurance product, the CPAGold™  program affords
its members valuable risk management and risk control services, including a twelve (12) CE
credit risk management course that is approved by the National Association of State Boards of
Accounting and access to a legal hotline with Ralph Picardi, Esq.

13.     The inception date of the first policy produced by Sutherland for the CPAGold™
program was May 10, 1999.  Given that Sutherland was merely Jorgensen's Massachusetts's
sales office, all of the accounts that Sutherland brought in as sales leads were actually
administered by and billed through Jorgensen in New Jersey.    By way of example, the April 24,
2000 renewal form for the first policy generated by Jorgensen's "Massachusetts office" the year
before was signed by Sutherland as producer.  It is attached in redacted form to the Complaint as

Exhibit "A".   Jorgensen also initially paid for the office equipment and supplies used by Sutherland.

14.     In or around May 1999, Vono also joined Jorgensen as an independent contractor producer based in Massachusetts.   Soon thereafter, Sutherland and Vono decided to form their own agency – a partnership called North American Professional Liability Insurance Agency ("NAPLIA Partnership").  By July 1999, the NAPLIA Partnership became one of approximately twelve partner-producers for Jorgensen who focused on the sale of accountants' and lawyers' professional liability programs, CPAGold™ and LawGold™ respectively, that were and continue to be managed by Jorgensen.  The business generated by the NAPLIA Partnership, however, centered on CPAGold™.

15.     Given that the NAPLIA Partnership was not incorporated, Jorgensen formed a licensed umbrella agency they could use, "Jorgensen & Co. Professional Liability Insurance Brokerage Inc.", that was based in Massachusetts.   This licensed company – which was formed on August 12, 1999, ironically is registered at NAPLIA's present office.  Sutherland was and still is a Director of this company.  *See* Exhibit "B".

16.     After Tuncel left Landy in June 2003, he started a web hosting company called Spiderweb hosting.  Given their preexisting relationship via Landy, Tuncel solicited Jorgensen and in November 2003 Jorgensen became one of Tuncel's web hosting clients.   Upon information and belief, Tuncel sold the web-hosting company in 2004 and joined NAPLIA as an insurance producer.

17.     On May 20, 2004, North American Professional Liability Insurance Agency, LLC, *i.e.*, Defendant NAPLIA, was formed as a Delaware limited liability company and Sutherland and Vono were initial members of NAPLIA.  In the Massachusetts registration statement of NAPLIA in which Sutherland "affirms and swears, under the pains and penalties of perjury, that to the best of the undersigned's knowledge and belief, the foregoing statements are

true as of this 11th day of June, 2004" there is found the following statement:  "The general character of the business of the LLC is to act exclusively as an insurance producer".  *See* Exhibit "C".

18.     First with the NAPLIA Partnership and then after its formation as Defendant NAPLIA, NAPLIA became a very intimate and trusted partner-producer of Jorgensen.  For example, Jorgensen sought to educate Sutherland and his team regarding the product they were selling so it brought Sutherland, Vono and Tuncel to various negotiations with carriers and reinsurers and shared with them underwriting data as well as proprietary premium calculation Excel worksheets.   Jorgensen also worked closely with the NAPLIA Partnership and NAPLIA so that they could fully understand the intent of new endorsements and learn about new professional liability product lines, including architects and engineers, miscellaneous professional liability, and wealth managers errors and omissions insurance.  And, during meetings with insurers and at industry conferences such as the Association for Accounting Administration, NAPLIA was always introduced as a trusted and important business partner of Jorgensen.

19.      Despite being an independent producer, with insurer's consent, NAPLIA was also given the authority to pre-underwrite CPAGold™ accounts – with Hunt Jorgensen, LLC, a sister company of Jorgensen, fully underwriting and actually binding coverage for the accounts.  This provided NAPLIA with a very advantageous, fast and efficient sales approach that was ultimately a significant contributor to NAPLIA's early sales success.  This also gave NAPLIA access to Jorgensen's proprietary worksheets and data, which Jorgensen only shared with the understanding that the information provided was confidential and proprietary information belonging to Jorgensen.

20.     Although all of Jorgensen's partner-producers could access the CPAGold™ program, the NAPLIA Partnership – and then NAPLIA after it was formed in 2004, received

Jorgensen's production leads, protection from competition by way of the Jorgensen position of declining broker of record letters from other brokers, and NAPLIA submission's receiving priority attention from Jorgensen's underwriters. Jorgensen also shared details of confidential statistical data, underwriting authority statements and program management agreements with NAPLIA. Jorgensen went so far as to also employ several Massachusetts-based underwriters to work with the NAPLIA Partnership and NAPLIA on the CPAGold™ program.

21.     Jorgensen's strong relationship with NAPLIA yielded solid success.  It was not until the past several years, however, that things began to deteriorate.  For example, Jorgensen learned NAPLIA was apparently affiliating itself with less than savory characters.  One such character was Sean Ferris, who was referred to Jorgensen by NAPLIA for employment.  At the suggestion of Sutherland, Jorgensen interviewed Ferris for a producer position in Massachusetts. Ferris met with Jorgensen on February 27, 2013 and Jorgensen offered him a position on March 1, 2013 with a start date of March 25, 2013.  The offer was accepted that same day. Unbeknownst to Jorgensen at the time the offer was made on March 1, 2013, the local Massachusetts press reported that Ferris was arrested on February 20, 2013 after he was allegedly involved in an illegal prescription drug transaction and charged with conspiracy to violate the Controlled Substances Act as well as possession of Oxycodone.  Ferris' employment with Jorgensen ended in August 2013.

22.     In early 2013, during re-underwriting NAPLIA's accounts for Jorgensen's attorney professional liability program, LawGold™, Jorgensen uncovered significant abnormalities on individual files.  It was ultimately uncovered that one of NAPLIA's insurance producers – Anthony Weiner - had been falsifying applications, issuing binding quotes to clients without Jorgensen's prior approval, and omitting material information from submissions.  When Jorgensen asked Sutherland to help resolve these discrepancies, Sutherland's response was that Anthony Weiner was an independent contractor of NAPLIA and NAPLIA could not be at fault

for Mr. Weiner's actions.   In August 2013, Mr. Weiner was arrested on charges of attempted murder, kidnapping, assault and battery with the intent to intimidate and cause bodily injury, among others.  He is apparently now serving a jail term.

23.     It now appears that NAPLIA may have also been charging an improper "policy fee" in addition to the CPAGold™ policy premium.  After receiving quotes from Jorgensen, NAPLIA's practice was always to send out its own quotes on its own letterhead.  More to the point, NAPLIA never provided Jorgensen with copies of any of its issued quotes.   Based on copies of several NAPLIA quotes recently obtained and confirmation made by a policyholder on October 2, 2015, NAPLIA apparently adds an additional $100 fee to the quotes provided by Jorgensen to NAPLIA.  NAPLIA hid this fact by omitting Jorgensen as General Agent in premium finance agreements (where any fees would have been disclosed to Jorgensen) and by intentionally removing details of premiums, taxes and fees on forms required by Jorgensen for State regulatory purposes.

24.     In an email of October 15, 2014 from Rickard Jorgensen to Sutherland pertaining to Cyber coverage underwritten by Lloyd's of London, Jorgensen drew Sutherland's attention to the laws concerning the legality of additional fees for insurance.  Accordingly, as of October 15, 2014 – if not sooner, NAPLIA should have been on actual notice that the charging of fees in addition to premium was not in compliance with State laws.

25.     Upon information and belief, NAPLIA has for years charged the majority of its clients this fee without an appropriately worded and legally mandated fee agreement.  If there were no such proper fee agreements in place, the CPAGold™ members are likely entitled to restitution by NAPLIA of all improper fees paid to NAPLIA – potentially over a $1 million dollars.

CPA ProSecure Insurance Program

26.     By way of letter, dated April 8, 2003, Sutherland received information from

Marsh Affinity Group Services regarding a "ProSecure" professional liability insurance program for lawyers.  *See* Exhibit "D".

27.     Fast forward to August 3, 2015, Sutherland and NAPLIA use the name "ProSecure" for a newly launched accountant insurance program – a program built on the trade secrets and copyrights belonging to Jorgensen.

28.     Slightly more than a week before launching its competitive program, Sutherland wrote an email, dated July 24, 2015, to Rickard Jorgensen of Jorgensen, formally terminating the relationship and informing Mr. Jorgensen of NAPLIA's new competitive program:

> Effective today we will no longer send you CPAGold™ renewal submissions.
>
> I have informed my staff.
>
> As I mentioned, I would like to end this 16 year relationship on a high note and formally believe we can co-exist and both do well in the future.
>
> We will notify our current CPAGold™ book by letter that we have a new program and that they will not be getting renewal terms from XL.

29.     In response, on July 29, 2015, Mr. Jorgensen wrote Sutherland an email that contains the following request:  "As a housekeeping issue could you please delete any copies of our proprietary rate worksheets that relate to our products and any reference to our programs from your website and other materials?"

30.     Sutherland had previously agreed to keep confidential material provided by Jorgensen. Specifically, in February 2003, the NAPLIA partnership – consisting of the individuals Sutherland, Vono and Tuncel, entered into an agreement called "Producer Agreement – CPAGold™ ™  February 2003" with "Hunt Jorgensen, LLC d/b/a Jorgensen and Company" that states the following:

X.    During the term of this AGREEMENT and upon termination of this AGREEMENT, PRODUCER shall treat all PROGRAM information which is not publicly available, as confidential information and shall not disclose, communicate or share such items or information with any third party without JORGENSEN's prior written approval.

\* \* \*

XII.   If and to the extent that PRODUCER shall, in connection with this AGREEMENT, come into possession of any information, business or technology of the JORGENSEN that is not known to the public, PRODUCER shall treat such information as confidential, and not to disclose such information to any person(s) or entity not a party to this AGREEMENT.

31.    Accordingly, the individuals who manage and own NAPLIA are contractually bound by a confidentiality provision protecting confidential material obtained from Jorgensen regarding the CPAGold™ program.  In addition to the NAPLIA Partnership, NAPLIA also independently recognizes its own confidentiality obligations given that by way of an email, dated August 11, 2015, Sutherland writes on behalf of NAPLIA:  "we are following [the agreement] to the letter."

32.    Apparently not fully recognizing how this agreement operates or who is bound by it – and completely ignoring the fact there is a Hackensack, New Jersey arbitration clause in it, legal counsel from NAPLIA recently sent a "cease and desist" letter to Mr. Jorgensen requesting that Jorgensen not market to those CPAGold™ members who were broker clients of NAPLIA. It is important to point out that Jorgensen does not have a signed copy of this agreement – only an unsigned draft.   On October 8, 2015, a request was made for the signed agreement. *See* Exhibit "E".

33.    The trade secret information obtained by NAPLIA principals over the past sixteen years goes well beyond premium calculation rate sheets.   Sutherland and his team attended many meetings with CPAGold™ program and carrier underwriting teams and claims staff. Sutherland was also made intimately aware of Jorgensen's relationships, program details, results and negotiations concerning coverage enhancements as well as reinsurance.   Jorgensen also

often introduced underwriters to NAPLIA's office in Massachusetts. During this time Sutherland pretended to be a trusted and intimate business associate of Jorgensen, while in truth he and his colleagues were collecting data and confidential information and using it to develop a product in direct competition with Jorgensen.

34.     NAPLIA's bad faith is evident in the fact it chose to retain its "preferred status" with Jorgensen while knowing it was going to launch a directly competitive insurance program. Indeed, NAPLIA knew about its launch of a competitive program well before the July 24, 2015 termination date given it was appointed an agent for Plaza on November 3, 2014.  NAPLIA necessarily already had an executed agreement in place with Plaza for "CPA ProSecure" given that Plaza only writes program business.  And, given that Jorgensen had no knowledge that NAPLIA was about to launch a program that directly competed with CPAGold™, NAPLIA retained its status as a preferred producer-partner of Jorgensen and was afforded full access to confidential information regarding the CPAGold™ program throughout 2014 and up to July 24, 2015.

35.     In fact, NAPLIA mischaracterized their activities in the insurance marketplace by stating they were going to launch a "non-standard APL program" for high risk accounting firms that would complement CPAGold™.  As set forth in an email attached as Exhibit "F", titled "Non-Standard APL program," in early 2015 Jorgensen was looking to send submissions to Sutherland for this "non-standard" program.    Sutherland's statements regarding the launch of a "non-standard" program were in fact a web of deceit designed to elicit additional confidential information from Jorgensen and provide no prior warning that NAPLIA intended to set-up as a direct competitor to CPAGold™  rather than a non-competitive "non-standard" program.

36.     Indeed, NAPLIA sought and obtained CPAGold™ bulk loss run information from Jorgensen beginning in 2014 – likely soon after it determined it was wanted to launch a program competitive to the CPAGold™ program.  Upon information and belief, NAPLIA used such loss

run information – proprietary to only the carrier, Jorgensen as program manager, and the insured, to convince Plaza to underwrite the CPA ProSecure program.

37.      On two separate occasions, Tuncel and Sutherland also requested details of CPAGold™ confidential panel counsel list.  This request was directed to XL's claims staff to avoid Jorgensen being aware of the request.  Upon information and belief, this information was provided to the claims staff of Plaza, NAPLIA's new partner insurer.

38.      By way of further example, since August 2015, John Raspante – an employee of NAPLIA with the title of "Director of Risk Management" but who is actually a producer licensed in the States of New Jersey and New York, has undertaken an improper marketing campaign directed towards CPAGold™ members by mischaracterizing and disparaging the CPAGold™ program.  A sample redacted letter to a member is attached as Exhibit "G".  The fact that these letters are being sent to CPAGold™ members right before renewal indicates that NAPLIA is improperly using confidential information – there simply would be no other way for NAPLIA to have such information for an unsolicited "cold call" letter other than by obtaining it from Jorgensen.

39.      Upon information and belief, NAPLIA is currently still using Jorgensen's confidential information, including but not limited to, premium calculation rate worksheets to underwrite accounts for CPA ProSecure, prospect and existing account lists, and draft endorsement language.

## COUNT I

## COPYRIGHT INFRINGEMENT
## AS TO ALL DEFENDANTS

40.      Plaintiffs repeat and reallege each of the allegations contained in paragraph 1 through 39 of this Complaint with the same force and effect as if fully set forth herein.

41.      On May 15, 2003, the CPAGold™  "Insurance Program, including policies and rates" were registered with the United States Copyright Office by way of Registration Number

TX 5-759-463 for "CPA Gold Accountants' Professional Liability Insurance Program" ("Protected Work") and such copyright in the Protected Work is valid and subsisting. *See* Exhibit "H". By way of operation of law and assignment, Jorgensen is the owner of all rights under such copyright.

42. At all times relevant after the filing of the Protected Work with the Copyright Office, Defendants have had access to the Protected Work. At all relevant times hereto, Defendants have advertised, offered for sale and sold insurance policies based on an insurance program substantially similar to the Protected Work and in violation of Jorgensen's exclusive rights in the Protected Work. By way of example, the rate sheet found in the Protected Work is attached as Exhibit "I". In comparison, the filed rate sheet used in the CPA ProSecure program for the state of Pennsylvania is attached hereto as Exhibit "J". Even a cursory review of these two plans demonstrates that they are substantially similar. Not surprisingly, the few minor differences in these two rate plans stem from changes that were made by Jorgensen to the CPAGold™ after the copyright filing in 2003.

43. The unauthorized use by Defendants of the Protected Work was and is knowing and willful. Sutherland personally participated in the infringing activities and used NAPLIA to carry out this deliberate infringement.

44. The aforementioned conduct is in violation of the Copyright Act of 1976, as amended (17 U.S.C. § 101 et seq.), and as a result of such copyright infringement by Defendants, Plaintiff has suffered significant monetary damages and has caused and threatens to cause irreparable injury to Plaintiff Jorgensen, for which Plaintiff has no adequate remedy at law.

**COUNT II**
**COMMON LAW UNFAIR COMPETITION**
**AS TO ALL DEFENDANTS**

45.    Plaintiffs repeat and reallege each of the allegations contained in paragraph 1 through 44 of this Complaint with the same force and effect as if fully set forth herein.

46.    The aforementioned acts of Defendants constitute unfair competition in violation of the common law of the State of New Jersey.  As to Defendants Plaza and Rockhill, they either knew or consciously avoided the fact Defendant NAPLIA was utilizing confidential information belonging to Jorgensen in order to prepare and launch the CPA ProSecure program.

47.    Such conduct on the part of Defendants has injured Plaintiff Jorgensen and has caused and threatens to cause irreparable injury to Plaintiff Jorgensen, for which Plaintiff has no adequate remedy at law.

**COUNT III**
**TORTIOUS INTERFERENCE WITH CONTRACTUAL**
**RELATIONS AND PROSPECTIVE ECONOMIC RELATIONS**
**AS TO DEFENDANTS SUTHERLAND AND NAPLIA**

48.    Plaintiffs repeat and reallege each of the allegations contained in paragraph 1 through 47 of this Complaint with the same force and effect as if fully set forth herein.

49.    On September 2, 2015, Sutherland – on behalf of NAPLIA, sent out an email to a partner-producer of Jorgensen to discuss a program it no longer had any right discussing.  Specifically, Sutherland wrote in his email:   "I was hoping to talk to you about XL CPAGold™ program."  Upon information and belief, NAPLIA is improperly trying to solicit other agents of Jorgensen by misrepresenting its ownership of Jorgensen's intellectual property and interfering with the relationship between Jorgensen and these partner-producers.

50.    As one of the largest program managers of accountant professional liability insurance, Jorgensen enjoys a reasonable expectation of economic benefit in the growth of the

CPAGold™ program.  This expectation is reasonable by virtue of Jorgensen's significant marketing expenditures, intellectual property developed over a period of several decades, and interested prospective customers.

51.     Upon information and belief, Defendant NAPLIA has sent out mass mailings to CPA firms in New Jersey containing false and misleading statements regarding the CPAGold™ program.

52.     Upon knowledge and belief, Defendants Sutherland and NAPLIA are using confidential contact information acquired during the time NAPLIA was an insurance producer for CPAGold™, to communicate with the majority of Jorgensen partner-producers in an attempt to solicit these agents to the new CPA ProSecure program.

53.     Upon information and belief, Defendant NAPLIA has organized a conference of Jorgensen's insurance agents on October 16, 2015 at the Hampton Inn, Natick, Massachusetts, to directly solicit and otherwise interfere with Jorgensen's business relationships with its partner-producers.

54.     In addition to misleading statements concerning CPAGold™ in brochures printed and circulated by NAPLIA, NAPLIA implies in its marketing material for CPA ProSecure that the claims staff at XL/Catlin are inadequate.  Specifically, NAPLIA states in its brochure:

> Your insurance policy is only as good as the claims handling and claims support. Over the last year we have been very impressed with the caliber of defense attorneys that are assigned to our insureds, but less impressed with the initial claims handling at the carrier level.

Exhibit "K" at 4.

55.     Defendant NAPLIA also engaged long-term risk management consultant to CPAGold™, Ralph Picardi, Esq., to give Jorgensen's partner-producers and members of CPAGold™ the false impression that CPA ProSecure was a successor to CPAGold™.  In a brochure for CPA ProSecure, NAPLIA goes so far as to falsely characterize Mr. Picardi as having a longstanding relationship with NAPLIA when the relationship was actually newly

minted.  *See* Exh. "K" at 2 ("NAPLIA is pleased to formally introduce Attorney Ralph Picardi, who has served as our Risk Management Consultant for the last 15 years.").

56.    Upon information and belief, Defendants Sutherland and NAPLIA had knowledge of the expectancy of economic benefit had by Jorgensen, but chose to intentionally and without justification or excuse interfere with that expectancy by virtue of the conduct outlined herein, including but not limited to the unlawful use of Jorgensen's intellectual property and the false and misleading statements made regarding CPAGold™ as well as CPA ProSecure.

57.    There was and is a reasonable probability that Plaintiffs would have received the above-referenced anticipated economic benefit in the absence of the Defendant NAPLIA's interference and failure to adhere to the "rules of the game" by virtue of its unlawful conduct outlined herein.

58.    Longtime group members of the CPAGold™ program have and may in the future purchase a CPA ProSecure policy based on the wrongful conduct of Defendant NAPLIA. Jorgensen's reasonable expectation is that such clients would have continued with services provided by Jorgensen and remain with CPAGold™ but for the wrongful conduct of Defendants Sutherland and NAPLIA.   And, to the extent Defendants are successful in improperly convincing a member of CPAGold™ to move to CPA ProSecure, it will be at least one or two years before Jorgensen has the chance to have such member return to the program given the policy terms are for one to two years.  Moreover, by, among other things, making false claims regarding ownership of intellectual property, Defendants are improperly interfering with Jorgensen's existing relationships with partner-producers of CPAGold™.

59.    Such conduct on the part of Defendants Sutherland and NAPLIA has injured Jorgensen and has caused and threatens to cause irreparable injury, for which Plaintiff has no adequate remedy at law.

## COUNT IV
## FEDERAL FALSE ADVERTISING
## LANHAM ACT § 43, 15 U.S.C. § 1125
## AS TO DEFENDANT NAPLIA

60.     Plaintiffs repeat and reallege each of the allegations contained in paragraph 1 through 59 of this Complaint with the same force and effect as if fully set forth herein.

61.     NAPLIA issued a press release dated August 3, 2015 that is titled "Announcing CPA ProSecure: New Errors and Omissions Insurance Program for Accounting Firms." The release includes the following statement:  "We represent your best interests and provide the tools to make educated decisions on your insurance needs."  By stating:  "We represent your best interests", NAPLIA makes it clear that this release is directly addressing accounting firms  – potential clients of its new accounting program.  In other words, the language used is strictly intended to generate business for the program.

62.     In order to build a false sense of history and financial wherewithal, the release states:  "NAPLIA insures 1000's of accounting firms in all 50 states."  Such statement is false and misleading given that NAPLIA is merely an insurance brokerage agency that has never "insured" any accounting firm.

63.     The release also states:  "Founded in 1998, [North American Professional Liability Insurance Agency, LLC] focuses on providing our clients with resources to assess, understand, and manage the many exposures faced by running a professional practice."  Such statement is false and misleading given, as set forth above, NAPLIA was actually formed in 2004 – not 1998.

64.     In order to further its marketing efforts and convince accounting firms to purchase a policy, NAPLIA misleads regarding its background and the alleged benefits of the CPA ProSecure program.  For example, on its website, NAPLIA provides the following "history" of the company:

> The Company began operating as North American Professional
> Liability Insurance Agency, a.k.a NAPLIA LLC, in 1998. Getting

frustrated with the lack of resources that the clients were getting from the carriers, NAPLIA worked continuously to add risk management features, offer education and bring in experts to provide the value added resources that the carriers weren't giving. NAPLIA soon became known in the industry for offering those extras.   In 2000 NAPLIA got Ralph Picardi to join their legal counsel and he would become an integral part of the success on NAPLIA.   In 2001 Dogan Tuncel joined NAPLIA as a producer and quickly became one of the most successful producers for Accountants Professional Liability in the country.

Exhibit "L" (http://cpaprosecure.com/history)

65.     As set forth above, NAPLIA was formed in 2004 and not 1998.  More importantly Jorgensen – not NAPLIA, created the many added features provided to the CPAGold™ program sold by NAPLIA.  As with other marketing material, this "history" implies that Ralph Picardi "joined" legal counsel of NAPLIA whereas he remains part of an independent law firm and for the past sixteen years has been a valuable contributor to the success of the CPAGold™ program. The fact that Mr. Picardi now also provides services for other programs – including the CPA ProSecure program, certainly does not mean NAPLIA got him "to join their legal counsel."

66.     By way of another example, the former website operator, Dogan Tuncel, is lauded as "one of the most successful producers for Accountants Professional Liability in the country" yet it is never clarified how being a successful salesman can benefit an accounting firm's risk or insurance profile.  NAPLIA's reconfiguring of its prior history is well beyond mere puffery – it is a deliberate attempt to mislead accountants regarding the benefits of using the CPA ProSecure program.

67.     NAPLIA also misleads regarding its carrier partners for the CPA ProSecure program.  On its website, NAPLIA provides the following information regarding its program carriers:

- One of only 59 insurance carriers to have a 75 year track record of rated "A" excellent by A. M. Best
- 95 Consecutive quarterly dividends
- Forbes 50 most trustworthy financial companies in America

- State Auto Insurance has assets in excess of $3.9 billion with 2014 direct written premium of $1.98 billion.
- State Auto is re-insured by Munich RE, one of the largest reinsurers in the United States. It has been A+ rated (Superior) by the A.M. Best Company for 30-plus years.

Exhibit "M" (http://cpaprosecure.com/carriers)

68.     These statements are highly misleading.  First, what happened 75 years ago is not relevant to an accounting firm choosing an insurance carrier in 2015.  The omitted fact that State Auto was downgraded by A.M. Best from "A" to "A-" on April 15, 2015, however, is much more relevant.  As stated by A.M. Best in its press release announcing this downgrade:  "The ratings downgrade is based on State Auto's unfavorable five-year underwriting and operating results relative to the private passenger standard auto and homeowners composite, the deterioration of 2014 results due to adverse development on the run-off of its large commercial trucking and commercial restaurant specialty lines programs, and the potential for 2015 results to be negatively impacted by additional adverse development on these programs."  In order to prop up this current "A-" rating, Defendant NAPLIA references a reinsurer's "A+" rating and the former "A" rating of State Auto.

69.     Whether or not State Auto paid dividends only matters to an insured if the carrier is a mutual – which State Auto is not.  And, the fact that State Auto was named to the Forbes Most Trustworthy Financial Companies list in 2015 is also misleading.  Specifically, the fact that State Auto has a sufficiently high "Aggressive Accounting and Governance Risk" score to make the list for small market cap stocks is misleading given that such ranking has absolutely no bearing on either its claims experience or financial strength.

70.     Knowing State Auto's assets – without listing its reserves and other liabilities, is also highly deceptive.  Similarly, stating the amount of written premium is a deliberate distraction.  What is helpful is determining the surplus of CPA ProSecure's admitted partner-insurer, Plaza Insurance Company  – the company actually standing behind most of the policies sold under the CPA ProSecure program.  As per an A.M. Best Report dated July 20, 2015

report, that number only totals $26,273,000.   This means that Plaza only has that much excess of its liabilities for <u>its entire roster of policyholders</u> – not just for those who purchase policies under CPA ProSecure.   The fact that the ultimate parent company of Plaza has a larger surplus matters only to the extent that parent – State Auto, agrees to step into the shoes of Plaza should the need arise.

71.     NAPLIA's reference to Munich Re is also misleading.   The fact that State Auto operates primarily by way of reinsurance support should cause discomfort to potential clients and not relief – especially given that such reinsurance is renewed on an annual basis.   Simply put, if the reinsurer has a bad experience with a line of business – which may be even due to another program unrelated to this program, it may pull out.   Unless the carrier is financially able to directly take on the risk, it may not have the ability to fill such void – requiring the carrier to cease participation in the program altogether.

72.     Taken in their totality, these statements made by NAPLIA constitute false advertising in violation of Section 43 of the Lanham Act, 15 U.S.C. § 1125.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Jorgensen & Company demands judgment as follows:

1.     An order preliminarily and permanently enjoining Defendants, their partners, members, employees, agents, licensees, attorneys, successors, affiliates, subsidiaries and assigns, and all those in active concert and participation with any of them, including any entities controlled in whole or in part by any of the Defendants or their parents in the future, from: (a) imitating, copying or making unauthorized use of the Protected Work; (b) distributing, circulating, selling, offering for sale, advertising, promoting or displaying any goods bearing any unauthorized reproduction, copy or colorable imitation of the Protected Work; (c) engaging in any other activity, including the effectuation of assignments or transfers of its interests in unauthorized colorable imitations of the Protected Work, the formation of other corporations,

partnerships, associations or other entities or the utilization of any other devices, for the purposes of circumventing, evading, or avoiding or otherwise violating the prohibitions set forth in subsections 1(a) through 1(b) above.

2.    An order preliminarily and permanently enjoining Defendants, their partners, members, employees, agents, licensees, attorneys, successors, affiliates, subsidiaries and assigns, and all those in active concert and participation with any of them, including any entities controlled in whole or in part by any of the Defendants or their parents in the future, from copying or making unauthorized use of confidential material belonging to Jorgensen.

3.    An order requiring Defendants to preserve and produce all documents and things regarding, referring or reflecting the confidential material obtained from Jorgensen by Defendants, including but not limited to, any written, typed, photocopied, computer generated or stored, or other communications or representation, either stored manually or digitally in any computer memory, hard drive, server or other form retrievable by a computer which are currently in Defendants' custody, possession or control.

4.    An award to Plaintiff of monetary relief pursuant to 17 U.S.C. § 504 for Defendants' willful copyright infringement, including Plaintiff's actual damages, Defendants' profits, and/or statutory damages of $150,000 per infringing work.

5.    An award to Plaintiff of all profits realized by Defendants by virtue of their wrongful acts and directing that such profits be trebled due to Defendants' willful or willfully blind actions.

6.    An award of punitive damages against Defendants.

7.    Direct, compensatory, incidental, and consequential damages.

8.    An award of Plaintiff's costs in this civil action, including reasonable attorneys' fees and expenses, investigatory fees, and pre-judgment interest.

9.     An order providing that the Court retains jurisdiction of this action enabling Plaintiff to apply to the Court at any time for such further order, including any order interpreting, modifying or enforcing compliance with a prior order or providing for punishment for the violation of any order.

10.     An order granting to Plaintiff such other and further relief as the Court deem just. Pursuant to Fed. R. Civ. P. 38 (b), Plaintiff hereby demands a trial by jury on all issues.


By:  /s/ Paul E. Paray
Paul E. Paray
Zimmerman Weiser & Paray LLP
226 St. Paul Street
Westfield, New Jersey 07090
Tel:  (908) 654-8000
Fax: (908) 935-0751
pep@zwpllp.com

Attorneys for Plaintiff Jorgensen & Company

Dated:  October 8, 2015

## VERIFICATION

I, Rickard Jorgensen, of full age, verify as follows:

I am the President of Plaintiff in the within Verified Complaint and have read the allegations thereof.  I am familiar with the facts as set forth in the within Verified Complaint.  The allegations thereof are true of my own personal knowledge, except where made upon information and belief, which allegations I believe to be true.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct.


By: _____
RICKARD JORGENSEN

DATED:  October 8, 2015

# EXHIBIT "A"



*Warranty Letter*

# CPAGold
## Renewal Binding Order Form

*Please fax this form to Jorgensen & Company at 201-226-1201.*
*Please mail the original. Thank You.*

**Producer Name:**   Massachusetts Office

**Producer Address:** 70 Main St., Suite B, Wayland, MA 01778

—•—•—•—•—•—•—•—•—•—•—•—•—•—•—•—•—•—•—

**Name of Insured:**  ███████████

**Contact:**

**Insured Address:**  ███████████

**City:** ████    **State:** ███    **Zip:** ████

**Effective Date:**  5/1/00        **Retro Date: Full Prior Acts**

**Limits of Liability:** $1,000,000  each claim /  $1,000,000  annual aggregate

**Separate Limit** NO ~~yes~~

**Deductible:**    $5,000 each claim /$0 annual (aggregate)

**Loss Only** ~~YES~~ No

**Premium: $5,379.00**      **Finance through Jorgensen:**    Yes   No

**Endorsements:** Electronic Media

Selection of Counsel

(attach copies of any additional insureds/affiliations/known claims/etc. endorsements to this form)

**Additional Insureds:** _____

**Producer Signature** *Gary Sutherland*    **Date:** 4-24-2000

—•—•—•—•—•—•—•—•—•—•—•—•—•—•—•—•—•—•—

## JORGENSEN & COMPANY USE ONLY

**Date Received:** 4/27/2000    **Received By:** *Ofynn*

**Old Policy Number:** 390001    **Date Policy Issued:** _____

NEW POLICY # 391222

**PLEASE PRINT CLEARLY (TYPED IS PREFERRED)**
**THANK YOU**

# EXHIBIT "B"



**William Francis Galvin**
Secretary of the Commonwealth of Massachusetts



# Corporations Division

## Business Entity Summary

**ID Number: 000670032**

Request certificate    New search

**Summary for:  JORGENSEN & COMPANY, PROFESSIONAL LIABILITY INSURANCE BROKE***

| | |
|---|---|
| **The exact name of the Domestic Profit Corporation:**  JORGENSEN & COMPANY, PROFESSIONAL LIABILITY INSURANCE BROKE* | |
| **Entity type:**  Domestic Profit Corporation | |
| **Identification Number:** 000670032 | **Old ID Number:** 000000000 |
| **Date of Organization in Massachusetts:** 08-12-1999 | |
| | **Last date certain:** |
| **Current Fiscal Month/Day:** 12/31 | **Previous Fiscal Month/Day:** 00/00 |

**The location of the Principal Office:**

Address:  161 WORCESTER ROAD SUITE 504

City or town, State, Zip code, Country:    FRAMINGHAM,  MA  01701  USA

**The name and address of the Registered Agent:**

Name:   GARY B. SUTHERLAND

Address:  161 WORCESTER ROAD SUITE 504

City or town, State, Zip code, Country:    FRAMINGHAM,  MA  01701  USA

**The Officers and Directors of the Corporation:**

| Title | Individual Name | Address |
|---|---|---|
| PRESIDENT | RICKARD JORGENSEN | 145 DOREMUS AVE.,RIDGEWOOD, N.J, 07450 |
| PRESIDENT | RICKARD JORGENSEN | 145 DOREMUS AVE.,RIDGEWOOD, RIDGEWOOD, NJ 07450 USA |
| TREASURER | CAROL-JEANETTE JORGENSEN | 145 DOREMUS AVE.,RIDGEWOOD, N.J, 07450 |
| SECRETARY | CAROL-JEANETTE JORGENSEN | 145 DOREMUS AVE.,RIDGEWOOD, RIDTEWOOD, NJ 07450 USA |
| DIRECTOR | GARY SUTHERLAND | 16 FERNDALE ROAD NATICK, MA 01760 USA |

**Business entity stock is publicly traded:**

**The total number of shares and the par value, if any, of each class of stock which this business entity is authorized to issue:**

| Class of Stock | Par value per share | Total Authorized | | Total issued and outstanding |
| | | No. of shares | Total par value | No. of shares |
|---|---|---|---|---|
| CNP | $ 0.00 | 200,000 | $ 0.00 | 200,000 |
| CNP | $ 0.00 | 100 | $ 0.00 | 100 |

| | Consent | Confidential Data | Merger Allowed | Manufacturing |
|---|---|---|---|---|

**View filings for this business entity:**

ALL FILINGS
Administrative Dissolution
Annual Report
Application For Revival
Articles of Amendment
Articles of Charter Surrender

View filings

**Comments or notes associated with this business entity:**

New search

# EXHIBIT "C"

**APPLICATION FOR REGISTRATION**

**OF**

FILED

AUG 03 2004

SECRETARY OF THE COMMONWEALTH
CORPORATIONS DIVISION

## NORTH AMERICAN PROFESSIONAL LIABILITY INSURANCE AGENCY, LLC

The undersigned, being the Managing Member of North American Professional Liability Insurance Agency, LLC (the "LLC"), does hereby state and certify as follows:

1. The federal employer identification number of the LLC is

2. The name of the LLC is "North American Professional Liability Insurance Agency, LLC".

3. The name the LLC will use in Massachusetts is "North American Professional Liability Insurance Agency, LLC".

4. The LLC was organized in Delaware on May 20, 2004.

5. The general character of business of the LLC is to act exclusively as an insurance producer in accordance with applicable law including, without limitation, applicable laws and regulations of The Commonwealth of Massachusetts and such other jurisdictions where the Company is required to be so licensed or to register as a foreign business entity.

6. The business address of the LLC's principal office and its principal office in Massachusetts is 5 Whittier Street, Framingham, MA 01701.

7. The name and address of the LLC's resident agent is Gary Sutherland, 5 Whittier Street, Framingham, MA 01701.

8. The LLC has no specific date of dissolution.

9. Each of Gary Sutherland and Stephen Vono is authorized, on behalf of the LLC, to execute, acknowledge, deliver and record any recordable instrument purporting to affect an interest in real property, whether to be recorded in the registry of deeds or a district office of the land court.

IN WITNESS WHEREOF, the undersigned affirms and swears, under the pains and penalties of perjury, that to the best of the undersigned's knowledge and belief, the foregoing statements are true as of this _11th_ day of June, 2004.

NORTH AMERICAN PROFESSIONAL LIABILITY INSURANCE AGENCY, LLC

By: _____

Gary Sutherland
Authorized Person

# Delaware

PAGE   1

*The First State*

I, HARRIET SMITH WINDSOR, SECRETARY OF STATE OF THE STATE OF
DELAWARE, DO HEREBY CERTIFY "NORTH AMERICAN PROFESSIONAL
LIABILITY INSURANCE AGENCY, LLC" IS DULY FORMED UNDER THE LAWS
OF THE STATE OF DELAWARE AND IS IN GOOD STANDING AND HAS A LEGAL
EXISTENCE SO FAR AS THE RECORDS OF THIS OFFICE SHOW, AS OF THE
NINTH DAY OF JUNE, A.D. 2004.



*Harriet Smith Windsor*
Harriet Smith Windsor, Secretary of State

3806057   8300

040427900

AUTHENTICATION: 3162292

DATE: 06-09-04

Ck.# *133...*

## The Commonwealth of Massachusetts
### Limited Liability Company
### (General Laws, Chapter 156C)

893182

Filed this ___3RD___ day ___August___ ,2004

*William Francis Galvin*

## WILLIAM FRANCIS GALVIN
## SECRETARY OF THE COMMONWEALTH

*Peter J. Dunn, Esq.*
*Craig and Macauley Professional Corporation*
*Federal Reserve Plaza*
*600 Atlantic Avenue*
*Boston, MA 02210*

Phone: *(617) 367-9500*

# EXHIBIT "D"

**Rickard Jorgensen**

| | |
|---|---|
| **From:** | Gary Sutherland <garys@naplia.com> |
| **Sent:** | Tuesday, April 08, 2003 3:07 PM |
| **To:** | rickardj@jorgensenandcompany.com |
| **Subject:** | FW: ProSecure |
| **Attachments:** | Letter To Brokers Who Responded.doc; ProSecure policy highlights.pdf; GSI-06-LP-600 12-02 ProSecure App.pdf; GSI-06-LP-601 ProSecure Supp App Claim-Incident.pdf; GSI-06-LP-602 12-02 ProSecure Outside Interests Supp.pdf; GSI-06-LP-603 12-02 ProSecure Patent Supp.pdf; GSI-06-LP-604 12-02 ProSecure Plaintiff Supp.pdf; GSI-06-LP-605 12-02 ProSecure Real Estate Supp.pdf; GSI-06-LP-606 12-02 ProSecure Securities Supp.pdf; GSI-06-LP-607 12-02 ProSecure Environmental Supp.pdf; GSI-06-LP-608 12-02 ProSecure Financial Institutions Supp.pdf; GSI-06-LP-609 12-02 ProSecure Entertainment Supp.pdf |

BTW/FYI

Regards,

Gary Sutherland, CIC
North American Professional Liability Insurance Agency
5 Whittier Street, Framingham, MA 01701
Phone:        508.656.1300
Fax:            508.656.1399
Toll Free:    866.262.7542
Web Site:    www.naplia.com

-----Original Message-----
From: mary.whisenand@marshpm.com [mailto:mary.whisenand@marshpm.com]
Sent: Tuesday, April 08, 2003 1:50 PM
To: Gary Sutherland
Subject: ProSecure

Mr. Sutherland,

Thank you for contacting us regarding our ProSecure program.  Attached please find our cover letter and all of the documents required to submit business to our division.  All applications can be faxed back to 515-282-7839.

If you have any questions, please do not hesitate to contact me.

Mary E. Whisenand, AU, RPLU
Business Development Specialist
1-800-435-7904
Fax # 515-282-7839
mary.whisenand@marshpm.com

(See attached file: Letter To Brokers Who Responded.doc)(See attached file:
ProSecure policy highlights.pdf)(See attached file: GSI-06-LP-600 12-02 ProSecure App.pdf)(See attached file: GSI-06-LP-601 ProSecure Supp App Claim-Incident.pdf)(See attached file: GSI-06-LP-602 12-02 ProSecure Outside Interests Supp.pdf)(See attached file: GSI-06-LP-603 12-02 ProSecure Patent Supp.pdf)(See attached file: GSI-06-LP-604 12-02 ProSecure Plaintiff Supp.pdf)(See attached file: GSI-06-LP-605 12-02 ProSecure Real Estate Supp.pdf)(See attached file: GSI-06-LP-606 12-02 ProSecure Securities Supp.pdf)(See attached file: GSI-06-LP-607 12-02 ProSecure Environmental

Affinity Group Services
a service of Seabury & Smith
P.O. Box 10302
Des Moines, IA  50306-0302
Phone : 1-800-371-2246



April 8, 2003

Gary Sutherland
NAPLIA
5 Whittier Street
Framingham, MA  01701

Re:  Non-Standard Lawyers' Program

Dear Mr. Sutherland,

Thank you for your interest in ProSecure[SM] our newly created non-standard lawyers' program for small law firms.  Marsh has put together this nationwide program in response to developments in the marketplace in the last 24 months.  We are pleased to confirm that ProSecure[SM] is available in your state.  As you can appreciate, the attempt to find a *right price* and policy form for this type of product in nearly 100 rating territories is not an exact science.  We have begun to fine-tune the product from the standpoint of both form and price and would sincerely appreciate your constructive criticism.

Even if your first submissions to ProSecure[SM] may suggest we are too expensive or our terms are too restrictive, we are confident our solid relationship with the underwriter, General Star, and their commitment to revise this product as market conditions warrant, will allow us to meet your needs over time.  We pledge to you that your feedback will be heard, and collectively we can modify this product to capture a significant part of this under served segment of the lawyers' professional liability marketplace.

Try us out for firms of five or less seeking A++ XV paper, pricing indications in 72 hours, and a long-term commitment to the insurance brokerage and legal communities.

Sincerely,

Mark Nunes, J.D.
Vice President
Marsh Affinity Group Services

Supp.pdf)(See attached file: GSI-06-LP-608 12-02 ProSecure Financial Institutions Supp.pdf)(See attached file: GSI-06-LP-609 12-02 ProSecure Entertainment Supp.pdf)

# EXHIBIT "E"



From: **Paul E. Paray** pep@zwpllp.com
Subject: Re: NAPLIA Demand Letter
Date: October 8, 2015 at 2:27 PM
To: Dunn, Peter dunn@casneredwards.com
Bcc: ███████████████████████████

Mr. Dunn,

My firm represents Jorgensen & Company.  Your letter was forwarded to my attention.  Please send me the agreement you reference in your letter as soon as possible so that it can be reviewed in the context of your letter.

It is my understanding that there is an arbitration clause requiring that any matter arising out of a dispute involving the agreement be arbitrated in Hackensack, New Jersey.  Moreover, it is my belief this agreement is not with your existing client but rather the partnership that existed prior to the formation of NAPLIA.

I'm looking forward to obtaining what you represent to be the signed and enforceable agreement referenced in your letter.

It goes without saying but I'll say it anyway, please direct all future communications regarding this matter directly to my attention.

All the best.

Paul


**Paul E. Paray**
**Zimmerman Weiser & Paray LLP**
**226 St. Paul Street**
Westfield, NJ 07090
www.zwplaw.com
**Email**    pep@zwpllp.com
**Office**   (908) 654-8000
**Mobile**   (201) 281-5134
**Fax**      (908) 935-0751


**IMPORTANT NOTICE -- ATTORNEY-CLIENT PRIVILEGE & WORK PRODUCT RULE NOTICE**
The information in this email (and any attachments hereto) is confidential and may be protected by legal privileges and work product immunities. If you are not the intended recipient, you must not read, use or disseminate the information. Receipt by anyone other than the intended recipient is not a waiver of any attorney-client or work product privilege. If you have received this e-mail in error, please immediately notify me by "Reply" command and permanently delete the original and any copies or printouts thereof. Although this email and any attachments are believed to be free of any virus or other defect that might affect any computer system into which it is received and opened, it is the responsibility of the recipient to ensure that it is virus free and no responsibility is accepted for any loss or damage arising in any way from its use.


**From:** Dunn, Peter [mailto:dunn@casneredwards.com]
**Sent:** Monday, October 05, 2015 4:30 PM
**To:** Rickard Jorgensen
**Subject:** NAPLIA Demand Letter

Please see the attached demand letter sent on behalf of my client, NAPLIA.

**Peter I. Dunn**
**Attorney at Law**

Casner & Edwards, LLP
303 Congress Street
Boston, Massachusetts 02210

**Main:** 617-426-5900
**Fax:** 617-426-8810
**Email:** dunn@casneredwards.com
**Web:** casneredwards.com

This communication is intended only for the use of the individual or entity named as the addressee.  It may contain information which is privileged and/or confidential under applicable law.  If you are not the intended recipient or such recipient's employee or agent, you are hereby notified that any dissemination, copy or disclosure of this communication is strictly prohibited.  If you have received this communication in error, please immediately notify the sender by electronic mail or call 617-426-5900. Thank you for your cooperation.

# EXHIBIT "F"

**Rickard Jorgensen**

| | |
|---|---|
| **From:** | Gary Sutherland <garys@naplia.com> |
| **Sent:** | Wednesday, April 29, 2015 10:41 AM |
| **To:** | Rickard Jorgensen |
| **Subject:** | RE: Non-standard APL program |

Rick I cannot, I am still under a strict NDA,  the Cyber issue arose with the re-insurance treaty.

**From:** Rickard Jorgensen [mailto:RJorgensen@jorgensenandcompany.com]
**Sent:** Wednesday, April 29, 2015 10:12 AM
**To:** Gary Sutherland
**Subject:** RE: Non-standard APL program

OK.  Thanks. Just let me know when you are ready.  We would like to be supportive.

Can you share the insurer?  It's a new spin with a complimentary Cyber program.

*Rickard Jorgensen*
***Jorgensen & Company***
***(201) 345-2440***

*Please Note:  this reply is subject to the usual Jorgensen & Company privacy and confidentiality considerations - please do not copy or forward this email without my expresss written consent.*

**From:** Gary Sutherland [mailto:garys@naplia.com]
**Sent:** Wednesday, April 29, 2015 9:56 AM
**To:** Rickard Jorgensen
**Subject:** RE: Non-standard APL program

Rick, unfortunately not yet, we are getting closer but not there yet.

The newest hold up is how we will treat cyber coverage in the form, right now it looks to be a add on separate policy arrangement.

Pricing is set, re-insurance is all set, forms and apps mostly

**From:** Rickard Jorgensen [mailto:RJorgensen@jorgensenandcompany.com]
**Sent:** Wednesday, April 29, 2015 9:47 AM
**To:** Gary Sutherland
**Subject:** Non-standard APL program

We have a few contenders for this.  Can we send submissions to you?

Regards

Rickard

*Rickard Jorgensen*
***Jorgensen & Company***
*42 West Allendale Avenue*
*Allendale, NJ 07401*
*rjorgensen@jorgensenandcompany.com*
*(201) 447-4400, Ext. 100 Telephone*
*(201) 345-2440 Direct Dial*
*(201) 818-5680  Facsimile*

*Please Note:  The information contained herein and any documents accompanying this e-mail are privileged and confidential information from this company intended only for the use of the addressee named above.  If the reader of this message is not the intended recipient, please be aware that any dissemination, disclosure, distribution, use or copying of the contents of this information is strictly prohibited.  If you have received this communication in error, please immediately notify us by replying to this message and destroy this document by deleting it from your computer.  Coverage cannot be considered bound via electronic mail or other electronic means without receipt of a specific binding confirmation, verification of insurance or policy, including assignment of an insurer's policy number, from Jorgensen & Company.*

**EXHIBIT "G"**

**NAPLIA**
Professional Liability Insurance

North American Professional Liability Insurance Agency, LLC

September 21, 2015

Re: **Your Professional Liability Policy Changes**

Recently a large writer of accountant's errors and omissions insurance has terminated their program agreement with Greenwich Insurance, commonly referred to as the CPAGold program with XL/Catlin. This means over the next several months you will or have received a non-renewal letter from the program administrator, Jorgensen & Company. For those insured's that have received these letters many times over a period of years, we understand your frustrations.

While we understand that another carrier may be offering a CPAGold program, we wanted to write you and tell you that their other choices for your renewal and would ask you to consider our program, the CPA ProSecure. www.cpaprosecure.com  CPA ProSecure is a unique program that has a full-time CPA risk manager for our insureds and the program offers several resources and is the broadest in the industry.

We make it very easy to secure formal terms**, send us a copy of your current renewal application and a copy of your declarations page or complete the attached one page quick quote form, and we will within 48 business hours provide you a very competitive quote.**

What else can we do, how about never fill out an application again, our program does that for you every year, 45 days prior to your expiration date. Seeking more than one quote, we shop multiple carriers every year to make sure your renewal quote is both competitive and broad in coverage scope.

Since you will be needing to change carriers shortly, why not get a competitive quote with us this year?  We make the process extremely simple and take the headaches out dealing with non-renewal letters every few years.

Please do not hesitate and call me if you have any questions.

Sincerely,

*Home Office:*
161 Worcester Road, Suite 504
Framingham, MA 01701
Ph: 508.656.1300
Fax: 508.656.1399
Toll Free: 866.262.7542
www.naplia.com

*An Inc. 5000 Company*

# EXHIBIT "H"



FORM TX
For a Nondramatic Literary Work
UNITED STATES COPYRIGHT OFFICE

REGISTRATION NUMBER

**TX 5-759-463**

EFFECTIVE DATE OF REGISTRATION

5   15   03
Month   Day   Year

# CERTIFICATE OF REGISTRATION



This Certificate issued under the seal of the Copyright Office in accordance with title 17, United States Code, attests that registration has been made for the work identified below.The information on this certificate has been made a part of the Copyright Office records.

*Marybeth Peters*

REGISTER OF COPYRIGHTS
United States of America

**DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.**

**1**

**TITLE OF THIS WORK ▼**

CPAGold   Accountants' Professional   Liability Insurance   Program

**PREVIOUS OR ALTERNATIVE TITLES ▼**

**PUBLICATION AS A CONTRIBUTION** If this work was published as a contribution to a periodical, serial, or collection, give information about the collective work in which the contribution appeared.   **Title of Collective Work ▼**

If published in a periodical or serial give:   **Volume ▼**   **Number ▼**   **Issue Date ▼**   **On Pages ▼**

**2**

**NAME OF AUTHOR ▼**

a   Rickard Jorgensen

**DATES OF BIRTH AND DEATH**
Year Born ▼   Year Died ▼
1958

Was this contribution to the work a "work made for hire"?
☐ Yes
☐ No

**AUTHOR'S NATIONALITY OR DOMICILE**
Name of Country
OR ☐ Citizen of ▶ CANADA
Domiciled in ▶ USA

**WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK**
Anonymous?   ☐ Yes   ☑ No
Pseudonymous?   ☐ Yes   ☑ No

If the answer to either of these questions is "Yes," see detailed instructions.

**NATURE OF AUTHORSHIP** Briefly describe nature of material created by this author in which copyright is claimed. ▼

~~Insurance program, including policies and rates~~ entire text

**NOTE**

Under the law, the "author" of a "work made for hire" is generally the employer, not the employee (see instructions). For any part of this work that was "made for hire" check "Yes" in the space provided, give the employer (or other person for whom the work was prepared) as "Author" of that part, and leave the space for dates of birth and death blank.

**NAME OF AUTHOR ▼**

b

**DATES OF BIRTH AND DEATH**
Year Born ▼   Year Died ▼

Was this contribution to the work a "work made for hire"?
☐ Yes
☐ No

**AUTHOR'S NATIONALITY OR DOMICILE**
Name of Country
OR ☐ Citizen of ▶
Domiciled in ▶

**WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK**
Anonymous?   ☐ Yes   ☐ No
Pseudonymous?   ☐ Yes   ☐ No

If the answer to either of these questions is "Yes," see detailed instructions.

**NATURE OF AUTHORSHIP** Briefly describe nature of material created by this author in which copyright is claimed. ▼

**NAME OF AUTHOR ▼**

c

**DATES OF BIRTH AND DEATH**
Year Born ▼   Year Died ▼

Was this contribution to the work a "work made for hire"?
☐ Yes
☐ No

**AUTHOR'S NATIONALITY OR DOMICILE**
Name of Country
OR ☐ Citizen of ▶
Domiciled in ▶

**WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK**
Anonymous?   ☐ Yes   ☐ No
Pseudonymous?   ☐ Yes   ☐ No

If the answer to either of these questions is "Yes," see detailed instructions.

**NATURE OF AUTHORSHIP** Briefly describe nature of material created by this author in which copyright is claimed. ▼

**3**

a   **YEAR IN WHICH CREATION OF THIS WORK WAS COMPLETED** This information must be given in all cases.
1999 - 2003   ◀ Year

b   **DATE AND NATION OF FIRST PUBLICATION OF THIS PARTICULAR WORK** Complete this information ONLY if this work has been published.
Month ▶ 3 - 1 - 5   Day ▶ - 9   Year ▶ 1999   2003
United States   ◀ Nation

**4**

**COPYRIGHT CLAIMANT(S)** Name and address must be given even if the claimant is the same as the author given in space 2. ▼

Rickard Jorgensen
25 East Spring Valley Ave   Suite 270
MAYWOOD   NJ   07607

**TRANSFER** If the claimant(s) named here in space 4 is (are) different from the author(s) named in space 2, give a brief statement of how the claimant(s) obtained ownership of the copyright. ▼

**APPLICATION RECEIVED**
MAY 15 2003
**ONE DEPOSIT RECEIVED**
MAY 15 2003
**TWO DEPOSITS RECEIVED**

**FUNDS RECEIVED**

See instructions before completing this space.

DO NOT WRITE HERE
OFFICE USE ONLY

**MORE ON BACK ▶**   • Complete all applicable spaces (numbers 5-9) on the reverse side of this page.   • See detailed instructions.   • Sign the form at line 8.

DO NOT WRITE HERE

Page 1 of ___ pages

FORM TX

EXAMINED BY

CHECKED BY

CORRESPONDENCE
☐ Yes

FOR
COPYRIGHT
OFFICE
USE
ONLY

❊ Amended by C.O.  Authority telephone call of
6/27/03 with Rickard Jorgensen.

**DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.**

**PREVIOUS REGISTRATION** Has registration for this work, or for an earlier version of this work, already been made in the Copyright Office?
☐ Yes  ☐ No  If your answer is "Yes," why is another registration being sought? (Check appropriate box.) ▼
a. ☐ This is the first published edition of a work previously registered in unpublished form.
b. ☐ This is the first application submitted by this author as copyright claimant.
c. ☐ This is a changed version of the work, as shown by space 6 on this application.
If your answer is "Yes," give: Previous Registration Number ▶          Year of Registration ▶

**5**

**DERIVATIVE WORK OR COMPILATION**
**Preexisting Material** Identify any preexisting work or works that this work is based on or incorporates. ▼

**6**
a

**Material Added to This Work** Give a brief, general statement of the material that has been added to this work and in which copyright is claimed. ▼

b

See instructions
before completing
this space.

**DEPOSIT ACCOUNT** If the registration fee is to be charged to a Deposit Account established in the Copyright Office, give name and number of Account.
Name ▼                                    Account Number ▼

**7**
a

**CORRESPONDENCE** Give name and address to which correspondence about this application should be sent.  Name/Address/Apt/City/State/ZIP ▼
Rickard Jorgensen , 25 East Spring Valley Ave, Suite 270,
Maywood, NJ 07607.
Area code and daytime telephone number ▶ 201 226 1200 x 203   Fax number ▶ 201 226 1201
Email ▶ rickardj @ jorgensenandcompany.com

**CERTIFICATION*** I, the undersigned, hereby certify that I am the
Check only one ▶
☐ author
☐ other copyright claimant
☐ owner of exclusive right(s)
☐ authorized agent of
of the work identified in this application and that the statements made
by me in this application are correct to the best of my knowledge.

Name of author or other copyright claimant, or owner of exclusive right(s) ▲

**8**

Typed or printed name and date ▼ If this application gives a date of publication in space 3, do not sign and submit it before that date.
Rickard Jorgensen                              Date ▶ 5/3/2003

☞    Handwritten signature (X) ▼
X

Certificate
will be
mailed in
window
envelope
to this
address:

Name ▼
RICKARD JORGENSEN
Number/Street/Apt ▼
25 EAST SPRING VALLEY AVE , STE 270.
City/State/ZIP ▼
MAYWOOD , NJ . 07607.

• YOU MUST:
• Complete all necessary spaces
• Sign your application in space 8
• SEND ALL 3 ELEMENTS
  IN THE SAME PACKAGE:
1. Application form
2. Nonrefundable filing fee in check or money order
   payable to Register of Copyrights
3. Deposit material
MAIL TO:
Library of Congress
Copyright Office
101 Independence Avenue, S.E.
Washington, D.C. 20559-6000

As of
July 1,
1999,
the
filing
fee for
Form TX
is $30.

**9**

*17 U.S.C. § 506(e): Any person who knowingly makes a false representation of a material fact in the application for copyright registration provided for by section 409, or in any written statement filed in connection with the application, shall be fined not more than $2,500.
June 1999—200,000
WEB REV: June 1999

❊ PRINTED ON RECYCLED PAPER

☆U.S. GOVERNMENT PRINTING OFFICE: 1999-454-879/49

# EXHIBIT "I"

## Rating Guidelines

The rating calculation is as follows:  (Round to the nearest dollar after each step)

1.   Determine the **number of professionals** from the application.

2.   Determine the appropriate **Base Premium** for each professional employee of the firm *[See Note 1]*:

| # of years of prior insurance | Step |
|---|---|
| No prior acts coverage | 1 |
| One years of prior acts coverage | 2 |
| Two years of prior acts coverage | 3 |
| Three years of prior acts coverage | 4 |
| Four years or more of prior acts coverage | 5 |

Round up to the nearest year.

Total the appropriate **Base Premiums** for each professional employee (using full-time equivalents - *See Note 1a*) and divide the result by the total **number of professional employee** to produce an **Average Base Premium** for the firm.

3.   Multiply the number of professionals, including full-time equivalents, by the **Average Base Premium**. This yields the **Adjusted Base Premium**.

4.   Determine the **Billings Factor Adjustment** (0.75 minimum to 1.25 maximum) *[See Note 2]*:
   - Divide the total gross billings by total number of professionals to determine the gross receipts per professional
   - Divide the total gross receipts per professional by the average for the state.

5.   Determine the applicable **Practice Specialty Factors** and add them all together *[See Note 3]*.

6.   Determine the **Claim Debit/Credit** from the formula in the Experience Rating Plan *[See Note 4]*.

7.   Apply the **Claims Expenses Outside The Limit** adjustment if applicable *[See Note 5a]*.

8.   Determine if any **Individual Risk Modifications Factors** apply and add them all together to determine the appropriate credit or debit *[See Note 6]*.

9.   Determine the **Size Of Firm Credit** (if applicable) *[See Note 7]*.

10.   Multiply 4 x 5 x 6 x 7 x 8 x 9 to determine the **Total Modification Factor**.

11.   Multiply the **Basic Premium** developed in item 3 above, by the **Total Modification Factor** developed in item 10 above to determine the **Modified Base Premium**.

12.   Multiply the result from item 11 above by the appropriate **Deductible Factor** *[See Note 9]*.

13.   Multiply the result from item 12 above by the appropriate **Increased Limit Factor** *[See Note 5]*

14.   Determine the applicable **Loss Control Credit** (number of professionals who attended a loss control seminar divided by the number of professionals in the firm multiplied by 7.5%) *[See Note 8]*.

15.   Determine the **Longevity Credit** *[See Note 10]*.

16.   Determine the **Long-Term Agreement Credit** (if applicable) *[See Note 11]*.

17.   This is the **Final Annual Premium.**

<u>Note 1-- Base Premiums:</u>

|  | Step 1 | Step 2 | Step 3 | Step 4 | Step 5 |
|---|---|---|---|---|---|
| Territory 1 | 250 | 383 | 479 | 566 | 600 |
| Territory 2 | 290 | 445 | 556 | 657 | 697 |
| Territory 3 | 332 | 508 | 635 | 751 | 796 |
| Territory 4 | 373 | 571 | 714 | 844 | 895 |
| Territory 5 | 447 | 685 | 856 | 1,012 | 1,073 |

<u>Note 1a-- Base Premiums:</u>

Part-time professional staff should be rounded to the nearest .25 full-time equivalent based upon a 40 hour week, e.g. an employee working 15 hours would represent 0.25 employees; an employee working 25 hours would represent 0.50 employees, etc.  The total is calculated and this is added to the total of full-time professional employees.

<u>Note 2 -- Average Gross Billings (Effective 1.1.1999)</u>

| STATE (Territory): | A.G.B.: | STATE (Territory): | A.G.B.: |
|---|---|---|---|
| Alabama (1) | $130,000 | Montana (1) | $125,000 |
| Alaska (2) | $135,000 | Nebraska (1) | $130,000 |
| Arizona (3) | $140,000 | Nevada (1) | $130,000 |
| Arkansas (2) | $130,000 | New Hampshire (1) | $125,000 |
| California - LA (5) | $165,000 | New Jersey (3) | $155,000 |
| California (4) | $155,000 | New Mexico (1) | $130,000 |
| Colorado (2) | $135,000 | New York (3) | $150,000 |
| Connecticut (3) | $140,000 | New York - City (4) | $155,000 |
| Delaware (2) | $130,000 | North Carolina (2) | $130,000 |
| District of Columbia (2) | $130,000 | North Dakota (1) | $125,000 |
| Florida (3) | $140,000 | Ohio (2) | $130,000 |
| Georgia (2) | $135,000 | Oklahoma (1) | $125,000 |
| Hawaii (2) | $135,000 | Oregon (2) | $130,000 |
| Idaho (1) | $125,000 | Pennsylvania (3) | $150,000 |
| Illinois (3) | $150,000 | Rhode Island (2) | $130,000 |
| Indiana (1) | $125,000 | South Carolina (1) | $125,000 |
| Iowa (1) | $125,000 | South Dakota (1) | $125,000 |
| Kansas (1) | $125,000 | Tennessee (2) | $130,000 |
| Kentucky (1) | $130,000 | Texas (3) | $150,000 |
| Louisiana (2) | $130,000 | Utah (1) | $130,000 |
| Maine (1) | $125,000 | Vermont (1) | $125,000 |
| Maryland (2) | $130,000 | Virginia (1) | $125,000 |
| Massachusetts (3) | $140,000 | Washington (2) | $130,000 |
| Michigan (3) | $140,000 | West Virginia (1) | $125,000 |
| Minnesota (2) | $130,000 | Wisconsin (2) | $130,000 |
| Missouri (1) | $130,000 | Wyoming (1) | $130,000 |
| Mississippi (2) | $130,000 | | |

## Note 3 -- Practice Specialty

| Specialty | % of Practice: | Surcharge: |
|---|---|---|
| *Auditing (Closely held corporations):* | | |
| With engagement letter: | 1 – 35% | 0% |
| | 36 – 45% | 10.00% |
| | 46 – 55% | 15.00% |
| | 56 – 65% | 20.00% |
| | 66 – 75% | 25.00% |
| | Over 75% | 35.00% |
| Without engagement letter: | 1 – 15% | 5.00% |
| | 16 – 25% | 10.00% |
| | Over 25% | Decline |
| *Public Auditing:* | | |
| With engagement letter: | 1 – 25% | 0% |
| | 26 – 30% | 5.00% |
| | 31 – 35% | 10.00% |
| | Over 35% | 25.00% |
| Without engagement letter: | Any | Decline |
| *Financial Planning:* | 1 – 15% | 0% |
| | 16 – 35% | 5.00% |
| | 36 – 50% | 10.00% |
| | Over 50% | Decline |
| *Securities:* | 1 – 15% | 5.00% |
| | 15 – 30% | 10.00% |
| | Over 30% | 25.00% |
| *Financial Institutions:* (Conflict situations) | See Financial Institutions Guidelines | |

## Note 4 -- Experience Rating Plan

An additional premium adjustment for loss experience shall be applied as follows, base upon claims reported in the last five (5) years.  For the purposes of the adjustment, losses will only be considered "claims" if: i) loss and/or expense payments have been made in excess of $5,000; or ii) an insurer has established a claim file and carries an open reserve in excess of $5,000.

When a loss has been declared, but the reserve amount is unknown, 5% of the demand amount may be used as the best approximation of the claim value.

Each factor will be multiplied in sequence (a x b x c) and the product rounded to the nearest whole percentage to establish the final adjustment.

**A.** # of claims

| # of claims | Debit/(Credit) - # of Professionals in firm | | | | | |
|---|---|---|---|---|---|---|
| | 1 | 2-5 | 6-10 | 11-20 | 21-40 | 41 or more |
| 0 | (0.35) | (0.50) | (0.65) | (0.75) | (0.85) | (1.25) |
| 1 | 1.00 | 0.50 | 0 | (0.50) | (0.75) | (1.00) |
| 2 | 2.00 | 1.00 | 0.50 | 0 | (0.25) | (0.75) |
| 3 | 2.50 | 2.00 | 1.05 | 0.50 | 0 | (0.25) |
| 4 | 3.00 | 2.50 | 1.50 | 1.00 | 0.50 | 0 |
| 5 | A consent to rate form will be completed | | | | | |

**Note 4 -- Experience Rating Plan (Continued)**

If Table A indicates a debit (positive), multiply the factor from Table A by the factors specified in Table B.1 and Table C.1 as "Debit".  If Table A indicates a credit (negative), multiply the factor from Table A by the factors specified in Table B.2 and Table C.2 as "Credit".  If Table A indicates "0", no adjustment will apply.

**B.**   Years since claims were notified:

If there are multiple claims, average all of them and round (below 0.5 round down; above 0.5 round up).

|  | 1. Debit |  |  | 2. Credit |  |
|---|---|---|---|---|---|
| 1 year | 1.00 |  | 1 year | 0.80 |  |
| 2 years | 0.95 |  | 2 years | 0.85 |  |
| 3 years | 0.90 |  | 3 years | 0.90 |  |
| 4 years | 0.85 |  | 4 years | 0.95 |  |
| 4 years | 0.80 |  | 5 years | 1.00 |  |

**C.**   Total Amount of All Claims (indemnity and Expenses)

| Debit |  | Credit |  |
|---|---|---|---|
| $2,501 – 15,000 | 6 | $0 – 10,000 | 15 |
| $15,001 – 25,000 | 10 | $10,001 – 25,000 | 12 |
| $25,001 – 35,000 | 14 | $25,001 – 50,000 | 8 |
| $35,001 – 45,000 | 18 | $50,001 – 65,000 | 4 |
| $45,001 – 60,000 | 21 |  |  |
| $60,001 – 80,000 | 24 |  |  |
| $80,001 – 100,000 | 27 |  |  |

**Note 5 -- Increased Limit Factors**

| Limit of Liability | Factor | Limit of Liability | Factor |
|---|---|---|---|
| $100,000/$200,000 | 1.00 | $2,000,000/$6,000,000 | 2.71 |
| $250,000/$250,000 | 1.27 | $3,000,000/$3,000,000 | 2.85 |
| $250,000/$500,000 | 1.41 | $3,000,000/$6,000,000 | 3.13 |
| $500,000/$500,000 | 1.53 | $4,000,000/$4,000,000 | 3.53 |
| $500,000/$1,000,000 | 1.65 | $5,000,000/$5,000,000 | 3.88 |
| $1,000,000/$1,000,000 | 1.78 | $6,000,000/$6,000,000 | 4.10 |
| $1,000,000/$2,000,000 | 1.90 | $7,000,000/$7,000,000 | 4.29 |
| $1,000,000/$3,000,000 | 2.00 | $8,000,000/$8,000,000 | 4.46 |
| $2,000,000/$2,000,000 | 2.35 | $9,000,000/$9,000,000 | 4.61 |
| $2,000,000/$4,000,000 | 2.53 | $10,000,000/$10,000,000 | 4.74 |

**Note 5a -- Claims Expenses Outside the Limits:**

A 10% surcharge for claims expenses outside the limits will be applied in all states except New York (this is already built into the rate in New York).

**Note 6 -- Individual Risk Modification Plan**

The firm's basic limits premium shall be modified, subject to the maximum modification of 50% credit or 50% debit, to reflect such characteristics of the exposure to be insured that are not otherwise reflected in the rate. The modification factor to be applied will be the sum of the applicable credits or debits.

The following factors apply:

|  | Classification | Range Credit | Debit |
|---|---|---|---|
| 1. | Type of clients (Corporate/Government/ Individual, etc.) | 20% | 20% |
| 2. | Internal Management of the Firm: a) Standards of Control greater or less than those of peers; or, b) Participation in peer audit; or, c) Remedial action to improve past shortcomings. | 25% | 25% |
| 3. | Unusual risk conditions: Unique conditions of exposure not usual To the practice type outlined in the practice specialties. | 25% | 25% |
| 4. | Loss Control: a) Participation in loss control programs b) Absence of general acceptable loss Control technique | 10% | 10% |
| 5. | Ethics and Moral standing: a) Absence of ethical or moral standing as reflected by criminal complaint to a professional regulatory body; or, b) Contribution to the profession beyond the practices' usual sphere. | 10% | 10% |

**Note 7 – Size of Firm**

| # of Accounting Professionals: | Credit: |
|---|---|
| 1 – 3 | 0% |
| 4 – 5 | 4% |
| 6 – 9 | 8% |
| 10 – 13 | 11% |
| 14 – 16 | 13% |
| 17 – 20 | 18% |
| 21 – 30 | 20% |
| 31 – 50 | 25% |
| Over 50 | refer |

**Note 8 -- Loss Control Credit:**

If any member of the firm attends a loss control seminar, credit can be applied for three consecutive, subsequent years. The credit is determined by dividing the number of professionals in the firm that attended a loss control seminar by the total number of accounting professionals in the firm and multiplying the result by 7.50%. The maximum credit is 7.50% each year. For firms of 10 or more professionals, 70% or greater of professional staff attendees qualifies for 100% credit

### Note 9 – Deductible Factors – *including use arbitration clauses in engagement letters*

| Deductible: | Loss & Expenses | *with Arbitration* | Loss Only | *with Arbitration* |
|---|---|---|---|---|
| $500 | 1.10 | 1.045 | 1.20 | 1.14 |
| $750 | 1.05 | 1.00 | 1.10 | 1.045 |
| $1,000 | 1.00 | 0.95 | 1.05 | 1.00 |
| $2,000 | 0.97 | 0.92 | 1.02 | 0.97 |
| $3,000 | 0.945 | 0.90 | 0.99 | 0.94 |
| $4,000 | 0.925 | 0.88 | 0.97 | 0.92 |
| $5,000 | 0.91 | 0.865 | 0.95 | 0.90 |
| $10,000 | 0.84 | 0.80 | 0.91 | 0.86 |
| $15,000 | 0.79 | 0.75 | 0.87 | 0.83 |
| $20,000 | 0.75 | 0.71 | 0.84 | 0.80 |
| $25,000 | 0.71 | 0.675 | 0.81 | 0.77 |
| $35,000 | 0.655 | 0.62 | 0.765 | 0.73 |
| $50,000 | 0.60 | 0.57 | 0.72 | 0.68 |
| $75,000 | 0.55 | 0.52 | 0.69 | 0.66 |
| $100,000 | 0.50 | 0.475 | 0.65 | 0.62 |

For aggregate deductibles, the following charges are applicable:

1. 0.75% charge of the final policy premium if the aggregate deductible is 3 times the per claim deductible
2. 1.50% charge of the final policy premium if the aggregate deductible is 2 times the per claim deductible
3. 2.50% charge of the final policy premium if the aggregate deductible is equal to the per claim deductible

### Note 10 – Longevity Credit:

If the Named Insured, or any predecessor firm, has been continuously insured for professional liability insurance via this program or any qualifying predecessor program, a credit may be applied as follows:

| Years of Coverage: | Credit: |
|---|---|
| 1 – 2 | 0% |
| 3 – 5 | 5% |
| 6 or more | 10% |

[N.B. Not applicable in New York state]

### Note 11 -- Long Term Agreement Credit/Premium Guarantee:

Note available in Kansas.

## Special Considerations

### Financial Institutions

An analysis of the rating of the financial institution is required to ensure a minimum level of financial stability (used S&P or similar).

Financial institutions are subject to further review if the supplementary application reveals the following circumstances:

1.  An insured provides professional services to, and owns stock in, a financial institution.
2.  An insured provides professional services and is a Director, officer or serves on the financial institution's internal committees (conflict situations).
3.  An insured provides professional services to, and has a loan of $250,000 or more from, a financial institution.

If such situations arise, further information is required and this may result in the specific exclusion of a particular financial institution.

### Single Limit Engagements

This is rated as if *small firm*, that is the engagement is rated using the number of personnel employed, the fees generated by the specific engagement and the appropriate factor for the increased limit required.   The resultant additional premium is (a).

The additional premium is then calculated for the *small firm*, using the limit of the current firm (b).

The net additional premium is calculated using (a) – (b).

Subject to a minimum premium of $750 per $1,000,000 of additional limits.

### EPL Defense coverage:

- Retroactive limitation applies unless prior coverage
- Subject to short-form questionnaire or equivalent
- Rate - $50,000 limit: $25.00 per employee
     $100,000 limit: $30.00 per employee

### Outside Not for Profit Positions coverage (Defense only):

- Retroactive limitation applies unless prior coverage
- Subject to short-form questionnaire or equivalent
- Rate - $100,000 limit: $100.00 per position
  Rate - $250,000 limit: $150.00 per position

# EXHIBIT "J"

# PLAZA INSURANCE COMPANY
## Accountants Professional Errors And Omissions Program

**Rating Guidelines**

The rating calculation is as follows: (Round to the nearest dollar after each step)

1. Determine the **number of professionals** from the application.

2. Determine the appropriate **Base Premium** for each professional employee of the firm *[See Note 1]*:

   | # of years of prior insurance | Step |
   |---|---|
   | No prior acts coverage | 1 |
   | One years of prior acts coverage | 2 |
   | Two years of prior acts coverage | 3 |
   | Three years of prior acts coverage | 4 |
   | Four years or more of prior acts coverage | 5 |

   Round up to the nearest  year.

   Total the appropriate **Base Premiums** for each professional employee (using full-time equivalents - *See Note 1a*) and divide the result by the total **number of professional employee** to produce an **Average Base Premium** for the firm.

3. Multiply the number of professionals, including full-time equivalents, by the **Average Base Premium**. This yields the **Adjusted Base Premium**.

4. Determine the **Billings Factor Adjustment** (0.75 minimum  to 1.15 maximum) *[See Note 2]*:
   - Divide the total gross billings by total number of professionals to determine the gross receipts per professional
   - Divide the total gross receipts per professional by the average for the state.

5. Determine the applicable **Practice Specialty Factors** and add them all together *[See Note 3]*.

6. Determine the **Claim Debit/Credit** from the formula in the Experience Rating Plan *[See Note 4]*.

7. Apply the **Claims Expenses Outside The Limit** adjustment if applicable *[See Note 5a]*.

8. Determine if any Individual Risk Modifications Factors apply and add them all together to determine the appropriate credit or debit *[See Note 6]*.

9. Determine the **Size Of Firm Credit** (if applicable) *[See Note 7]*.

10. Multiply 4 x 5 x 6 x 7 x 8 x 9 to determine the **Total Modification Factor**.

11. Multiply the **Basic Premium** developed in item 3 above, by the **Total Modification Factor** developed in item 10 above to determine the **Modified Base Premium**.

12. Add the cost of any optional professional coverage endorsement *[See Special Considerations]*.

13. Apply Tax Preparers credit if applicable *[See Note 11]*

14. Multiply the result from item 12 above by the appropriate **Deductible Factor** *[See Note 9]*.

15. Multiply the result from 13 above by the appropriate **Increased Limit Factor** *[See Note 5]*

16. Determine the applicable **Loss Control Credit** (number of professionals who attended a loss control seminar divided by the number of professionals in the firm multiplied by 7.5%) *[See Note 8]*.

17. Determine the **Longevity Credit** *[See Note 10]*.

18. Add premium for EPL and Outside Positions Defense coverage *[See Special Considerations]*.

19. This is the **Final Annual Premium**.

**PLAZA INSURANCE COMPANY**
**Accountants Professional Errors And Omissions Program**

<u>Note 1-- Base Premiums:</u>

| <u>Step 1</u> | <u>Step 2</u> | <u>Step 3</u> | <u>Step 4</u> | <u>Step 5</u> |
|---|---|---|---|---|
| 365 | 559 | 699 | 826 | 876 |

<u>Note 1a-- Base Premiums:</u>

Part-time professional staff should be rounded to the nearest .25 full-time equivalent based upon a 40 hour week, e.g. an employee working 15 hours would represent 0.25 employees; an employee working 25 hours would represent 0.50 employees, etc. The total is calculated and this is added to the total of full-time professional employees.

<u>Note 2 – State Parameters (Gross Billings)</u>

Pennsylvania – State Average Gross Billings **= $199,650**

<u>Note 3 -- Practice Specialty</u>

| Specialty | % of Practice | Surcharge |
|---|---|---|
| *Auditing (Closely held corporations):* | | |
| With engagement letter: | 1 – 35% | 0% |
| | 36 – 45% | 10.00% |
| | 46 – 55% | 15.00% |
| | 56 – 65% | 20.00% |
| | 66 – 75% | 25.00% |
| | Over 75% | 35.00% |
| Without engagement letter: | 1 – 15% | 5.00% |
| | 16 – 25% | 10.00% |
| | Over 25% | Decline |
| *Public Auditing:* | | |
| With engagement letter: | 1 – 25% | 0% |
| | 26 – 30% | 5.00% |
| | 31 – 35% | 10.00% |
| | Over 35% | 25.00% |
| Without engagement letter: | Any | Decline |
| *Financial Planning:* | 1 – 15% | 0% |
| | 16 – 35% | 5.00% |
| | 36 – 50% | 10.00% |
| | Over 50% | Decline |
| *Securities:* | 1 – 15% | 5.00% |
| | 15 – 30% | 10.00% |
| | Over 30% | 25.00% |

*Financial Institutions:* See Financial Institutions Guidelines
*(Conflict situations)*

# PLAZA INSURANCE COMPANY
## Accountants Professional Errors And Omissions Program

**Note 4 -- Experience Rating Plan**

An additional premium adjustment for loss experience shall be applied as follows, based upon claims reported in the last five (5) years. For the purposes of the adjustment, losses will only be considered "claims" if: i) loss and/or expense payments have been made in excess of $5,000; or ii) an insurer has established a claim file and carries an open reserve in excess of $5,000.

When a loss has been declared, but the reserve amount is unknown, 5% of the demand amount may be used as the best approximation of the claim value.

Each factor will be multiplied in sequence (a x b x c) and the product rounded to the nearest whole percentage to establish the final adjustment.

**A.**

| # of claims | Debit/(Credit) - # of Professionals in firm | | | | | |
|---|---|---|---|---|---|---|
| | 1 | 2-5 | 6-10 | 11-20 | 21-40 | 41 or more |
| 0 | (0.35) | (0.50) | (0.65) | (0.75) | (0.85) | (1.25) |
| 1 | 1.00 | 0.50 | 0 | (0.50) | (0.75) | (1.00) |
| 2 | 2.00 | 1.00 | 0.50 | 0 | (0.25) | (0.75) |
| 3 | 2.50 | 2.00 | 1.05 | 0.50 | 0 | (0.25) |
| 4 or more* | 3.00 | 2.50 | 1.50 | 1.00 | 0.50 | 0 |

*\* Referral to the company for approval is required if more than 4 claims*

If Table A indicates a debit (positive), multiply the factor from Table A by the factors specified in Table B.1 and Table C.1 as "Debit". If Table A indicates a credit (negative), multiply the factor from Table A by the factors specified in Table B.2 and Table C.2 as "Credit". If Table A indicates "0", no adjustment will apply.

**B.** Years since claims were notified:
If there are multiple claims, average all of them and round (below 0.5 round down; above 0.5 round up).

| | 1. Debit | | 2. Credit |
|---|---|---|---|
| 1 year | 1.00 | 1 year | 0.80 |
| 2 years | 0.95 | 2 years | 0.85 |
| 3 years | 0.90 | 3 years | 0.90 |
| 4 years | 0.85 | 4 years | 0.95 |
| 5 years | 0.80 | 5 years | 1.00 |

**C.** Total Amount of All Claims (indemnity and Expenses)

| Debit % | | Credit % | |
|---|---|---|---|
| $2,501 – 15,000 | 6 | $0 – 10,000 | 15 |
| $15,001 – 25,000 | 10 | $10,001 – 25,000 | 12 |
| $25,001 – 35,000 | 14 | $25,001 – 50,000 | 8 |
| $35,001 – 45,000 | 18 | $50,001 – 65,000 | 4 |
| $45,001 – 60,000 | 21 | | |
| $60,001 – 80,000 | 24 | | |
| $80,001 – 100,000 | 27 | | |

**Note 5 -- Increased Limit Factors**

| Limit of Liability | Factor | Limit of Liability | Factor | Limit of Liability | Factor |
|---|---|---|---|---|---|
| $100,000/$200,000 | 1.00 | $1,000,000/$3,000,000 | 2.00 | $5,000,000/$5,000,000 | 3.88 |
| $250,000/$250,000 | 1.27 | $2,000,000/$2,000,000 | 2.35 | | |
| $250,000/$500,000 | 1.41 | $2,000,000/$4,000,000 | 2.53 | | |
| $500,000/$500,000 | 1.53 | $2,000,000/$6,000,000 | 2.71 | | |
| 500,000/$1,000,000 | 1.65 | $3,000,000/$3,000,000 | 2.85 | | |
| $1,000,000/$1,000,000 | 1.78 | $3,000,000/$6,000,000 | 3.13 | | |
| $1,000,000/$2,000,000 | 1.90 | $4,000,000/$4,000,000 | 3.53 | | |

# PLAZA INSURANCE COMPANY
## Accountants Professional Errors And Omissions Program

**Note 5a -- Claims Expenses Outside the Limits:**

A 10% surcharge for claims expenses outside the limits will be applied.

**Note 6 -- Individual Risk Modification Plan**

Unless referred to the Company's underwriting committee, the firm's basic limits premium shall be modified to reflect such characteristics of the exposure to be insured that are not otherwise reflected in the rate. The modification factor to be applied will be the sum of the applicable credits or debits, and is limited to +/-40%.
The following factors apply:

| Classification | % Range | |
| --- | --- | --- |
| | Credit | Debit |
| 1 Type of clients (Corporate/Government/Individual, etc.) | 20 | 20 |
| | | |
| 2 Internal Management of the Firm: | | |
|    a) Standards of Control greater or less than those of peers; or, | | |
|    b) Participation in peer audit; or, | 25 | 25 |
|    c) Remedial action to improve past shortcomings. | | |
|    d) Outside client directorships. | | |
| | | |
| 3 Unusual risk conditions: | | |
|    Unique conditions of exposure not usual | 25 | 25 |
|    To the practice type outlined in the practice specialties. | | |
| | | |
| 4 Loss Control | | |
|    a) Participation in loss control programs | 10 | 10 |
|    b) Absence of general acceptable loss Control technique | | |
| | | |
| 5 Ethics and Moral standing: | 10 | 10 |
|    a) Absence of ethical or moral standing as reflected by criminal complaint to a professional regulatory body; or, | | |
|    b) Contribution to the profession beyond the practices' usual sphere. | | |

**Note 7 – Size of Firm**

| # of Accounting Professionals: | Credit: |
| --- | --- |
| 1 – 3 | 0% |
| 4 – 5 | 4% |
| 6 – 9 | 8% |
| 10 – 13 | 11% |
| 14 – 16 | 13% |
| 17 – 20 | 18% |
| 21 – 30 | 20% |
| 31 – 50 | 25% |
| Over 50 | refer |

**Note 8 -- Loss Control Credit:**
If any member of the firm attends a loss control seminar, credit can be applied for three consecutive, subsequent years. The credit is determined by dividing the number of professionals in the firm that attended a loss control seminar by the total number of accounting professionals in the firm and multiplying the result by 7.50%. The maximum credit is 7.50% each year. For firms of 10 or more professionals, 70% or greater of professional staff attendees qualifies for 100% credit)

# PLAZA INSURANCE COMPANY
## Accountants Professional Errors And Omissions Program

### Note 9 – Deductible Factors – including use of arbitration clauses in engagement letters

| Deductible: | Loss & Expenses | with Arbitration | Loss Only | with Arbitration |
|---|---|---|---|---|
| $500 | 1.10 | 1.045 | 1.20 | 1.14 |
| $750 | 1.05 | 1.00 | 1.10 | 1.045 |
| $1,000 | 1.00 | 0.95 | 1.05 | 1.00 |
| $2,000 | 0.97 | 0.92 | 1.02 | 0.97 |
| $3,000 | 0.945 | 0.90 | 0.99 | 0.94 |
| $4,000 | 0.925 | 0.88 | 0.97 | 0.92 |
| $5,000 | 0.91 | 0.865 | 0.95 | 0.90 |
| $10,000 | 0.84 | 0.80 | 0.91 | 0.86 |
| $15,000 | 0.79 | 0.75 | 0.87 | 0.83 |
| $20,000 | 0.75 | 0.71 | 0.84 | 0.80 |
| $25,000 | 0.71 | 0.675 | 0.81 | 0.77 |
| $35,000 | 0.655 | 0.62 | 0.765 | 0.73 |
| $50,000 | 0.60 | 0.57 | 0.72 | 0.68 |
| $75,000 | 0.55 | 0.52 | 0.69 | 0.66 |
| $100,000 | 0.50 | 0.475 | 0.65 | 0.62 |
| $250,000 | 0.45 | 0.425 | 0.60 | 0.58 |

For aggregate deductibles, the following charges are applicable:
1. 0.75% charge of the final policy premium if the aggregate deductible is 3 times the per claim deductible
2. 1.50% charge of the final policy premium if the aggregate deductible is 2 times the per claim deductible
3. 2.50% charge of the final policy premium if the aggregate deductible is equal to the per claim deductible

### Note 10 – Longevity Credit:
If the Named Insured, or any predecessor firm, has been continuously insured for professional liability insurance via this program or any qualifying predecessor program, a credit may be applied as follows:

| Years of Coverage: | Credit: |
|---|---|
| 1- 2 | 0% |
| 3-5 | 5% |
| 6 or more | 10% |

### Note 11 – Tax Preparers Credit
For those policyholders that agree to limit coverage in accordance with the Tax Preparers Endorsement, a credit of 50% of the base premium will be awarded.

### Special Considerations
#### Financial Institutions
An analysis of the rating of the financial institution is required to ensure a minimum level of financial stability (use S&P or similar).

Financial institutions are subject to further review if the supplementary application reveals the following circumstances:

1. An insured provides professional services to, and owns stock in, a financial institution.
2. An insured provides professional services and is a Director, officer or serves on the financial institution's internal committees (conflict situations).
3. An insured provides professional services to, and has a loan of $250,000 or more from, a financial institution. If such situations arise, further information is required and this may result in the specific exclusion of a particular financial institution.

#### Single Limit Engagements

This is rated as if *small firm*, that is the engagement is rated using the number of personnel employed, the fees generated by the specific engagement and the appropriate factor for the increased limit required. The resultant additional premium is (a).

The additional premium is then calculated for the *small firm*, using the limit of the current firm (b).

The net additional premium is calculated using (a) – (b).

Subject to a minimum premium of $750 per $1,000,000 of additional limits.

PLZ-APEO-PA
ED. 04 15

PLAZA INSURANCE COMPANY

**PLAZA INSURANCE COMPANY**
**Accountants Professional Errors And Omissions Program**

**Optional Coverage Endorsements**
(this charge may be waived if percentage of Area of Practice is 10% or less)

The cost for Optional Professional Coverage endorsements are as follows:
    Each Registered Representative:        $300
    Each Life Insurance Agent:              $235

# EXHIBIT "K"



*Your Professional Liability coverage has been upgraded...*

## Highlights of the enhanced features offered under the CPA ProSecure Program

| Insurance Companies | **Rockhill Insurance Group, which is comprised of:**<br>▸▸ Plaza Insurance Company<br>▸▸ Plaza Indemnity Insurance Company (CA)<br>▸▸ Rockhill Insurance Company |
|---|---|
| **A.M. Best & Company Rating (April of 2015)** | A- [Excellent] Stable |
| **Parent Company** | **State Automobile Mutual**<br>▸▸ Group Assets of $3.98 Billion (2014)<br>▸▸ 75 years of A.M. Best rating of excellent or better, one of only 59 insurance companies to have this honor |

## Policy Improvements

| | |
|---|---|
| **Supplemental additional claims expenses** | 10% of limits up to $250,000 |
| **First-party Cyber coverage** | $50,000 per policy aggregate with an additional $50,000 of defense coverage |
| **Expense reimbursement** | $1,250 per day up to $100,000 per policy aggregate |
| **Discrimination complaints** | Full policy limits |
| **Deductible incentives for using engagement letters** | 50% waiver of deductible up to $25,000 per claim with a $50,000 per policy aggregate |
| **Disciplinary and Regulatory coverage** | $50,000 with a $100,000 aggregate |
| **Reduced deductible with alternative dispute resolution and/or mediation** | 100% waiver of deductible up to $30,000 and additional waiver of another 50% up to $50,000 |
| **IRS 7216 coverage** | $35,000 per policy period with no deductible |
| **Regulatory Privacy coverage** | $10,000 per policy period with no deductible |



*Hotline and Claims Triage have been upgraded...*

## Highlights of the enhanced features offered under the CPA ProSecure Program

**The CPA ProSecure Hotline is designed to assist accountants with all of the following:**

▶▶ Advice on early claim intervention

▶▶ Suggestions for appropriate limitation language for engagement letters or client fee-for-service contracts

▶▶ Best practice consultation for maintaining client relationships

**Claims Triage is used to quickly assess the following attributes of a subpoena, incident or claim:**

▶▶ Nature and facts of the reported matter

▶▶ Potential damages

▶▶ Possibility of facts to mitigate damages

▶▶ Possible outcomes

▶▶ Possible defenses

▶▶ Need for experts

*NAPLIA is pleased to formally introduce Attorney Ralph Picardi, who has served as our Risk Management Consultant for the last 15 years.*



▶▶ Ralph graduated cum laude from University of San Diego School of Law, where he served on the editorial board of the Law Review. He graduated magna cum laude from Boston College School of Management with a B.S. in Accounting.

▶▶ His legal practice concentrates primarily on the area of defending accountants, lawyers and other professionals in matters of professional liability. In addition to litigation, Ralph specializes in advising accountants, lawyers, and their insurers in matters of coverage, and in matters of loss control through hotlines, seminars, risk management audits and publications.

▶▶ He is a current member of the American Institute of Certified Public Accountants, the Massachusetts Society of Certified Public Accountants and the Professional Liability Underwriting Society.



**CPA ProSecure**

*Risk Management Services have been upgraded…*

## Highlights of the enhanced features offered under the CPA ProSecure Program

You can look forward to some of these **Risk Management Services**:

- Best practices
- Engagement letter review
- Web site review
- NASBA approved webinars
- Industry updates

- CPA alerts
- Tax organizer review
- Quality control document review
- Marketing material review
- Risk management tools

## NAPLIA is pleased to introduce John Raspante, Senior VP & Director of Risk Management.



John Raspante, CPA, CDFA, works directly with clients, providing risk management services to top-tier accounts. He also is responsible for developing and delivering NAPLIA's National Association of State Boards of Accountancy (NASBA) CPE programs. John is the former Director of Compliance and Risk Management and the Director of Education for Graf Repetti & Co. LLP, Certified Public Accountants & Business Advisors.

Prior to joining Graf Repetti he was employed by CAMICO Mutual Insurance Company as a loss prevention specialist and large account national advisor. John's professional affiliations include memberships in the AICPA and six state accounting societies. He also serves on NYSSCPA's Compilation and Review Committee, NJSCPA's Editorial Board and the Accounting and Auditing interest group, and the National Conference of CPAs' Ethics Committee.

John is a frequent author and speaker within the accounting profession on issues relating to risk management.

**"What differentiates NAPLIA from other agencies is having a full-time risk manager/CPA on staff who consults with our clients on a daily basis."** – Gary Sutherland, CEO



CPA ProSecure

*What You Need to Know*

## Question: Why is NAPLIA changing carriers?

**Answer:** We have spent the better part of a year researching and selecting a replacement carrier for our accountants program because we wanted to improve in four critical areas:

### 1. Risk management

Risk management has always been a flagship of our agency. We expanded our risk management services in 2012 with the hiring of John Raspante. Over the last year we have added the following enhanced risk management capabilities:

- ▸▸ NASBA approved webinars (#119397)
- ▸▸ Website reviews
- ▸▸ CPA alerts
- ▸▸ Ethics CE courses
- ▸▸ Industry alerts
- ▸▸ Industry whitepapers

### 2. Claims Handling

Your insurance policy is only as good as the claims handling and claims support. Over the last year we have been very impressed with the caliber of defense attorneys that are assigned to our insureds, but less impressed with the initial claims handling at the carrier level. We wanted to partner with an insurance company who understands the importance of pre-claims assistance and the added value in claims handling. In order to strengthen our internal claims assistance processes we are continuing our partnership with independent attorney Ralph Picardi, Esq., who will provide claims triage. We also created an internal position at NAPLIA: Alison Lowell is our full-time Claims Coordinator. Alison will provide better communication to our insureds and help facilitate communication with the carrier and panel counsel.

### 3. Improved Policy Form and Endosements

Most insurance policies are dictated and written by the insurance company. We sought an insurance partner that allowed for NAPLIA to build the policy and endorsements with their team of experts. We were seeking improved coverage not currently available in the market. We spent considerable time and resources enhancing Network Security and Data Breach coverage. We took the position that we wanted more than "window dressing" coverage, so we engaged with several cyber experts to produce great coverage with risk management functionality. We also improved the Reducing Deductible, Expense Reimbursement, and Additional Claims Expenses endorsements.

### 4. Program Control

Program control allows NAPLIA and Rockhill to respond quickly to any new or emerging trends. We have essentially cut out "the middle man" and have direct access to the carrier, panel counsel, risk management advisors and attorneys. Four times a year we will host a carrier partner meeting to review and recommend any changes to the policy form, endorsements, claims handling or risk management initiatives. Once a year we will hold a full-day panel counsel conference to address issues directly related to claims and risk management for accountants.

> **"We sat down and created a wish list of the important features we wanted to enhance in our professional liability program. We used this as the foundation for CPA ProSecure. We chose Rockhill Insurance because they embraced our vision and supported our desire to provide a more comprehensive program."** – Stephen Vono, CFO/Principal

# EXHIBIT "L"

Search For:

Quick Quote

*Select Your State*



## CPA ProSecure

Call Toll-Free: 866.262.7542

HOME

ABOUT CPA PROSECURE

PRODUCTS & APPLICATIONS

RISK MANAGEMENT

CLAIMS HANDLING

CONTACT CPA PROSECURE

# ProSecure History



Solid companies come from solid beginnings. Here's the history of how CPA ProSecure came to be:

*In 1995 Gary Sutherland, Stephen Vono and Dogan Tuncel met working for a national program administer specializing in Accountants professional liability insurance founded in 1949. Learning the ways of doing things the right way and wrong way Gary decided to do things the right way and went off on his own in 1998. Shortly thereafter Stephen Vono joined him.*

*The Company began operating as North American Professional Liability Insurance Agency, a.k.a NAPLIA LLC, in 1998 . Getting frustrated with the lack of resources that the clients were getting from the carriers, NAPLIA worked continuously to add risk management features, offer education and bring in experts to provide the value added resources that the carriers weren't giving. NAPLIA soon became known in the industry for offering those extras.   In 2000 NAPLIA got Ralph Picardi to join their legal counsel and he would become an integral part of the success on NAPLIA.   In 2001 Dogan Tuncel joined NAPLIA as a producer and quickly became one of the most successful producers for Accountants Professional Liability in the country. Between 2007 and 2012 NAPLIA was named to The Inc. 5000 list of fastest*

*growing companies for five consecutive years and in 2007 Entrepreneur Magazine Hot 500 Fastest Growing Small Businesses.*

*In 2010 NAPLIA hired John Raspante as the Director of Risk Management. John was the former Director of Compliance and Risk Management for Graf Repetti & Co. LLP, and the former risk manager for CAMICO Mutual Insurance Company for 9 years.*

*In 2012 NAPLIA became the program administrator for a national Bookkeepers & Tax Preparers Professional Liability program (endorsed by the American Institute of Public Bookkeepers).   NAPLIA also became the national administrator for other professional liability programs.*

*In 2015 NAPLIA partnered with the State Auto Group and created the CPA ProSecure, the premier professional liability solution for public accounting firms nationwide, and became the Managing General Agent for the program.*

**NAPLIA/CPA ProSecure Timeline**

- 1998: Gary Sutherland and Steve Vono, former colleague's, band together to start NAPLIA
- 1999: NAPLIA gets its first office and first full time employee
- 2000: NAPLIA wins its 100th client
- 2000: Ralph Picard joins NAPLIA as legal counsel
- 2001: Dogan Tuncel joins NAPLIA
- 2004; NAPLIA is insuring firms nationally in all 50 States
- 2005: NAPLIA is recognized nationally as becoming one of the largest independent agents for Accountants Prof Liability
- 2010: John Raspante joins NAPLIA to head up risk management
- 2012: NAPLIA moves to its current office at 161 Worcester Road, Framingham, MA
- 2013: NAPLIA hires its 20th employee
- 2015: NAPLIA launches CPA ProSecure

**ABOUT CPA PROSECURE**

History

Management Team

Carriers

**PRODUCTS & APPLICATIONS**

Professional Liability

Products

**RISK MANAGEMENT**

Loss Prevention Hotline

Articles & Cases Studies

Engagement Letters

CPA ProSecure
161 Worcester Road, Suite 504
Framingham, MA 01701

Phone: 866.262.7542

NAPLIA Live & On
Demand Webinars

About CPA ProSecure    |    Contact CPA ProSecure

Site Map    |    Privacy Policy    |    Terms of Use

Copyright © 2015 CPA ProSecure. All Rights Reserved

# EXHIBIT "M"

Carriers | CPA ProSecure

Search For:

Quick Quote



Call Toll-Free: 866.262.7542

HOME

ABOUT CPA PROSECURE

PRODUCTS & APPLICATIONS

RISK MANAGEMENT

CLAIMS HANDLING

CONTACT CPA PROSECURE



There is no "off season" for this winning team.

CPA ProSecure is underwritten by Rockhill Insurance and the State Auto Group.



Rockhill Insurance is a wholly owned subsidiary of the State Auto Group.

Rockhill Insurance Group is a specialty insurance company offering admitted and non-admitted insurance in select market niches where underwriting teams are positioned to offer creative insurance solutions, underwriting expertise, and top tier service to our managing general underwriters.

State Auto Insurance has assets in excess of $3.9 billion with 2014 direct written premium of $1.98 billion.   State Auto Insurance is a member of The State Auto Group, which has been A-rated by the A.M. Best Company.



State Auto Group:

▶▶ One of only 59 insurance carriers to have a 75 year track record of rated "A" Excellent by A. M. Best
▶▶ 95 Consecutive quarterly dividends
▶▶ Forbes 50 most trustworthy financial companies in America

State Auto is re-insured by Munich RE, one of the largest reinsurers in the United States. It has been A+ rated (Superior) by the A.M. Best Company for 30-plus years.

In 2015, State Auto Group was named to the Forbes Most Trustworthy Financial Companies list.



**ABOUT CPA PROSECURE**

History

Management Team

Carriers

**PRODUCTS & APPLICATIONS**

Professional Liability

Products

**RISK MANAGEMENT**

Loss Prevention Hotline

Articles & Cases Studies

Engagement Letters

NAPLIA Live & On

CPA ProSecure
161 Worcester Road, Suite 504
Framingham, MA 01701

Phone: 866.262.7542

Demand Webinars

About CPA ProSecure    |    Contact CPA ProSecure

Site Map    |    Privacy Policy    |    Terms of Use

Copyright © 2015 CPA ProSecure. All Rights Reserved